**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No. 8:24-cv-317**

STATE OF FLORIDA; and FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION,

*Plaintiffs*,

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official capacity as*
*Administrator for the Centers for Medicare and*
*Medicaid Services*; DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
XAVIER BECERRA, *in his official capacity as*
*Secretary of Health and Human Services*,

*Defendants*.

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.      On June 22, 2023, Governor DeSantis signed into law Florida H.B. 121 to substantially expand the provision of subsidized health insurance to children in the State of Florida. *See* An Act Relating to Florida KidCare Program Eligibility, H.B. 121, 2023 Leg. (Fla. 2023). That program, and especially its expansion, depends on the collection of monthly premiums. The Biden Administration unlawfully seeks to undermine that requirement and turn the program into a free-for-all, threatening both its solvency and long-term stability. Those actions threaten Florida's expansion of the

1

program to more children in need.

2.     The State of Florida has provided subsidized health insurance for more than three decades to children in low- and moderate-income families who do not qualify for Medicaid. Since 1998, Florida has administered this insurance as part of the Children's Health Insurance Program ("CHIP"), a federal-state partnership under Title XXI of the Social Security Act, Pub. L. No. 105-33, 111 Stat. 251 (1997).

3.     As of October 2023, Florida CHIP provides insurance coverage for more than 119,000 children. Ex.1, Noll Declaration ¶ 3.

4.     An essential feature of Florida CHIP is its tiered cost-sharing. Families who elect to enroll at least one child in the program are required to pay a monthly premium to obtain insurance coverage, currently between $15 and $20 dollars per month. Failure to pay the monthly premium, after a 30-day grace period, results in disenrollment. Ex.2, Florida KidCare Program, Amendment FL-22-0034-CHIP, *Amendment to Florida's Title XXI Child Health Insurance Plan Submitted to the Centers for Medicare and Medicaid Services* (Mar. 11, 2021) ("Fla. CHIP Plan"), at 22–23, 97–98, 176–78.

5.     These premiums offset program costs, ensure Florida maintains a balanced budget as required by its state constitution, and preserve Florida CHIP as a bridge between Medicaid and private insurance rather than an entitlement program.

6.     Congress has expressly allowed cost-sharing with CHIP participants, including through the payment of monthly premiums. 42 U.S.C. § 1397cc(e). Congress has also allowed for the disenrollment of CHIP participants whose premiums are not

paid. *Id.* § 1397cc(e)(3)(C). The Centers for Medicare and Medicaid ("CMS"), which administers CHIP for the federal government, has similarly recognized cost-sharing and disenrollment for nonpayment. 42 C.F.R. §§ 457.342(b), 457.500–.560.

7.     Florida also offers CHIP participants 12 months of "continuous eligibility" and has done so voluntarily for almost two decades. Ex.2, Fla. CHIP Plan at 83, 91–92. With limited exceptions, that means Florida will not revisit the eligibility determination of CHIP participants during that period, even if their household incomes increase. CMS regulations have also allowed States to voluntarily offer continuous eligibility. 42 C.F.R. § 457.342(a). Both have existed alongside premium requirements as a condition of enrollment and maintaining CHIP coverage. *See id.* § 457.342(b).

8.     In late 2023, CMS issued a State Health Official letter ("SHO Letter"), Ex.3, and Frequently Asked Questions ("FAQs"), Ex.4, notifying States that they could no longer disenroll participants during periods of continuous eligibility, except in certain circumstances. The FAQs expressly prohibited disenrollment for nonpayment of premiums during the continuous eligibility period and announced that "the existing regulatory option at 42 CFR § 457.342(b)" to do so would "end on December 31, 2023." Ex.4, FAQs at 1.

9.     CMS justified the SHO Letter and FAQs by citing the Consolidated Appropriations Act, 2023 ("2023 CAA"), in which Congress amended the Social Security Act to require 12 months of continuous *eligibility* for any participants found

3

eligible for benefits under Medicaid or CHIP. Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022).

10.     The SHO Letter and FAQs badly misconstrue the 2023 CAA by incorrectly equating *eligibility* for CHIP benefits with *enrollment* in a CHIP plan and subsequent insurance coverage. Eligibility is the determination that someone qualifies to participate in CHIP—e.g., meets the State's income, residency, and age requirements. Enrollment means the participant is not only eligible but has agreed to participate in a CHIP plan and will pay the enrollment cost and monthly premiums as required. A participant can be eligible for CHIP benefits but not enrolled.

11.     The FAQs are contrary to law. They violate Congress's express allowance for "termination of coverage" for a CHIP participant's "failure to make a premium payment," 42 U.S.C. § 1397cc(e)(3)(C)(ii)(I), which was unaffected by the 2023 CAA. They also violate CMS's own long-existing, and still operative, regulation expressly permitting disenrollment during a continuous eligibility period, 42 C.F.R. § 457.342(b), and fail to provide for programs, like Florida's, that are statutorily grandfathered into the federal CHIP. *See* 42 U.S.C. § 1397cc(a)(3), (d).

12.     The FAQs also exceed CMS's authority. The 2023 CAA unambiguously requires that a child "remain *eligible* for [CHIP] benefits," not that the child remain *enrolled* in CHIP. 2023 CAA § 5112(a) (emphasis added). Where "the intent of Congress is clear, . . . the agency must give effect to that clear intent." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255–56 (11th Cir. 2020) (cleaned up).

13.    CMS's new position is also arbitrary and capricious because it lacks a reasoned explanation, fails to explain adequately CMS's sudden reversal, and fails to address States' considerable reliance interests and grandfathered programs.

14.    Moreover, though misleadingly labeled "Frequently Asked Questions," the FAQs attempt to amend the Code of Federal Regulations, effective December 31, 2023. *See* Ex.4, FAQs at 1. That final, substantive change to an existing regulation can only be made through notice-and-comment rulemaking under the Administrative Procedure Act ("APA").

15.    CMS's fundamental error conflating eligibility and enrollment threatens the integrity of Florida CHIP, including the more than $30 million collected in premium payments each year. Ex.1, Noll Declaration ¶ 4. CMS is effectually imposing an expansion of entitlement benefits for children, requiring the provision of insurance potentially at no cost for up to 11 months of the year. Florida has declined to expand many entitlement programs because doing so is not in the interest of the State and its residents, as it would put a tremendous strain on the provision of services, making it worse for everyone. *Cf.* Blase & Gonshorowski, Paragon Health Inst., *Resisting the Wave of Medicaid Expansion: Why Florida Is Right* (Dec. 2023), https:// paragoninstitute.org/wp-content/uploads/2023/12/Resisting-the-Wave-Florida-Medicaid.pdf. CMS cannot use the 2023 CAA to expand entitlements through the backdoor. Indeed, CMS undermines the ability of Florida and other States to expand CHIP to even more children in need.

16.    The FAQs should be declared unlawful, set aside, and enjoined.

5

**PARTIES**

17.     Plaintiff Florida is a sovereign state with the authority and responsibility to protect its sovereign interests, its public fisc, and the health, safety, and welfare of its citizens.

18.     Plaintiff Agency for Health Care Administration ("AHCA") is an agency and arm of Florida. AHCA administers Florida CHIP under Title XXI of the Social Security Act.[1]

19.     Defendant CMS is the federal agency that oversees federal approval, oversight, and funding for state CHIPs.

20.     Defendant Chiquita Brooks-LaSure is the Administrator of CMS. She is sued in her official capacity.

21.     Defendant Department of Health and Human Services ("HHS") is the parent federal agency of CMS.

22.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

**LEGAL STANDARD**

23.     The Administrative Procedure Act ("APA") "embodies [a] basic presumption of judicial review," *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 140 (1967), and requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C.

---

[1] Plaintiff Florida and Plaintiff AHCA are referred to collectively as "Florida" throughout this Complaint.

§ 706(2)(A), "in excess of statutory . . . authority," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

24.   "Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Thus, "as mere creatures of statute," agencies "must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019).

25.   Agency action also must be "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). Agencies may not ignore "important aspect[s] of the problem," *id.* at 43, or "change their existing policies" without "provid[ing] a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

26.   With limited exceptions, "under the APA generally . . . an agency must afford interested persons notice of proposed rulemaking and an opportunity to comment." *Florida v. HHS*, 19 F.4th 1271, 1286 (11th Cir. 2021); *see* 5 U.S.C. § 553(c). The APA's notice-and-comment requirements apply to, among others, actions that "effectively amen[d] a prior legislative rule." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see also See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (notice-and-comment "rulemaking [is] required" when an agency "adopt[s] a new position inconsistent with any . . . existing regulations").

## JURISDICTION AND VENUE

27.   This Court has jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, and 2201.

28.     Under the APA, any "final agency action" is subject to judicial review, and the United States has waived sovereign immunity so long as the plaintiff seeks only non-monetary relief. 5 U.S.C. §§ 702, 704; *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985).

29.     Agency action is "final" when it "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

30.     The FAQs are final agency action reviewable under the APA. They are unequivocal in their language and represent the culmination of CMS's "assess[ment]" of "how non-payment of premiums intersects with [continuous eligibility] under the [2023] CAA." Ex.3, SHO Letter at 4 n.14. They also impose new "obligations" under CHIP, *Bennett*, 520 U.S. at 178, because they prohibit Florida from disenrolling participants who fail to pay their premiums during the continuous eligibility period and require it to "absorb the costs of unpaid premiums." Ex.4, FAQs at 2. Moreover, "'legal consequences will flow'" from the FAQs, *Bennett*, 520 U.S. at 178, because under CMS's continuous *enrollment* requirement, States like Florida must alter their CHIPs, changing the policy balance selected by elected representatives and assuming the cost of premiums for participants who fail to make payments, or lose federal funding for operating an allegedly non-compliant program. The FAQs also purport to amend 42 C.F.R. § 457.342(b), itself a legislative rule that authorizes the very conduct CMS has prohibited.

31.     Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, and Florida is a resident of every judicial district and division in its sovereign territory, including this judicial district and division. *See Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022) ("It is well established that a state 'resides at every point within its boundaries.'" (alteration omitted) (quoting *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892))); *see also California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018) ("[A] state with multiple judicial districts 'resides' in every district within its borders."); *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) ("Texas resides everywhere in Texas."); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[C]ommon sense dictates that a state resides throughout its sovereign borders.").

## FACTUAL BACKGROUND

### Federal CHIP

32.     In 1997, Congress established CHIP under Title XXI of the Social Security Act to offer health insurance to "targeted low-income children" and certain other uninsured individuals who do not qualify for health insurance under Medicaid. 42 U.S.C. §§ 1397aa, 1397bb. CHIP is designed as a cooperative effort between States and the federal government. Each State develops and administers its own CHIP, and the federal government provides supplemental funding to help defray the program's costs. *See* 42 U.S.C. §§ 1397aa–1397mm.

9

33.     To obtain federal reimbursement for CHIP expenditures, a State's CHIP must generally comply with federal standards. *Id.* § 1397ff(a), (d)(2). States must therefore submit their CHIP plans to CMS for approval, and States must operate their programs in accordance with an approved plan. *Id.* § 1397ff(a)(1), (d)(1).

34.     States have considerable flexibility to implement CHIPs that best serve their residents. For example, Title XXI permits States to select the standards they use "to determine the eligibility of targeted low-income children," including standards "relating to the geographic areas to be served by the plan, age, income and resources . . . , residency, disability status (so long as any standard relating to such status does not restrict eligibility), access to or coverage under other health coverage, and duration of eligibility." *Id.* § 1397bb(b)(1)(A); 42 C.F.R. § 457.320(a). States may not, however, impose eligibility standards that favor children with higher family incomes, "deny eligibility based on . . . a preexisting medical condition," or "apply a waiting period" for certain coverage. 42 U.S.C. § 1397bb(b)(1)(B); 42 C.F.R. § 457.320(b).

35.     A child determined to be *eligible* for benefits may then *enroll* in the state CHIP and obtain health insurance coverage. *See, e.g.*, 42 U.S.C. § 1397cc(e)(3)(C)(i) (discussing "individuals *enrolled* under the plan" (emphasis added)). To qualify for federal funding, state CHIPs must provide participants with certain baseline insurance coverage, including coverage for basic health services, mental health services, and dental services. 42 U.S.C. § 1397cc(a), (c).

36.     Title XXI allows States to design their CHIPs to require cost-sharing by participants, including by charging "premiums, deductibles, [and] coinsurance" for

10

certain covered health services. *Id.* § 1397cc(e)(1)(A). Federal regulations detail state obligations related to "Enrollee Financial Responsibilities," including disclosure requirements and limitations on charges. 42 C.F.R. part 457, subpart E.

37.    Once enrolled in a state CHIP, participants are entitled to certain "[d]isenrollment protections," including receiving "reasonable notice of and an opportunity to pay past due" amounts and "an opportunity for an impartial review to address disenrollment," and prohibiting States from requiring payment of "past due premiums . . . as a condition of . . . reenrollment." *Id.* § 457.570; *see* 42 U.S.C. § 1397cc(e)(C)(ii). When a State elects to require cost-sharing, Congress has allowed the State to "terminat[e]" an enrollee's "coverage" for nonpayment after a 30-day grace period. 42 U.S.C. § 1397cc(e)(3)(C)(i).

38.    Through a 2016 rule finalized after notice-and-comment, CMS gave States the option of providing CHIP participants with a period of "continuous eligibility." 42 C.F.R. § 457.342; *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016); 78 Fed. Reg. 4,594 (Jan. 22, 2013). Congress had provided States a similar continuous eligibility "option" for Medicaid by statute. *See* 42 U.S.C. § 1396a(e)(12).

39.    If a State provides continuous eligibility in CHIP or Medicaid, "[a] child's eligibility may not be terminated during a continuous eligibility period, regardless of any changes in circumstances, unless:

(1) The child attains the maximum age . . . ;

(2) The child or child's representative requests a voluntary termination of eligibility;

(3)  The child ceases to be a resident of the State;

(4)  The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or

(5)  The child dies."

42 C.F.R. § 435.926(d); *see id.* § 457.342(b) (citing *id.* § 435.926(d)).

40.    CMS provided that for CHIP, *coverage* (i.e., *enrollment*) may also "be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees required under the State plan, subject to the disenrollment protections afforded under section 2103(e)(3)(C) of the [Social Security] Act (related to premium grace periods) and [42 C.F.R.] § 457.570 (related to disenrollment protections)." *Id.* § 457.342(b). This provision gives effect to the statutory allowance for termination of coverage for nonpayment of premiums. 42 U.S.C. § 1397cc(e)(3)(C).

41.    States can amend their plans at any time and may be required to do so when necessary to conform to new federal requirements. *See id.* § 1397ff(b)(1); 42 C.F.R. § 457.204(c). Plan amendments must be submitted to CMS for approval, and CMS is required to "promptly review . . . plan amendments . . . to determine if they substantially comply with" federal standards. 42 U.S.C. § 1397ff(c)(1); *see* 42 C.F.R. § 457.150. If CMS concludes the plan amendments do not "substantially comply," CMS "withholds payments to the State, in whole or in part," after "giving the State

notice" and "a reasonable opportunity for correction." 42 C.F.R. § 457.204(a); *see* 42 U.S.C. § 1397ff(d)(2).

42.     Congress also expressly grandfathered preexisting plans in three states—New York, Florida, and Pennsylvania—into CHIP. *Id.* § 1397cc(a)(3), (d)(1). These States are permitted to continue operating their plans, which Congress determined already provided "comprehensive . . . coverage" to children, under the CHIP program. *Id.* § 1397cc(a)(3); 42 C.F.R. § 457.440(a).

43.     States operating grandfathered programs may "modify" those programs "from time to time so long as [the program] continues to [include coverage of a range of benefits] and does not reduce the actuarial value of the coverage under the program below the lower of– (A) the actuarial value of the coverage under the program as of August 5, 1997, or (B) the actuarial value [of 'one of the benchmark benefit packages']." *Id.* § 1397cc(d)(2), (a)(2)(B); 42 C.F.R. § 457.440(b).

44.     States must submit annual reports to CMS on the operation of their CHIPs. 42 C.F.R. § 457.750. "CMS reviews State and local administration of the CHIP plan through analysis of the State's policies and procedures, on-site reviews of selected aspects of agency operation, and examination of samples of individual case records." *Id.* § 457.200. A State found to be operating its program in a way that does not comply with its approved plan or with federal standards is subject to withholding of federal funds. *Id.* § 457.204(a)(2).

*Florida CHIP*

45.     In 1990, before Congress established CHIP, the Florida Legislature created the Florida Healthy Kids Corporation as a public-private partnership to "improve access to health insurance for the state's uninsured children." *History,* Healthy Kids, https://www.healthykids.org/healthykids/history/ (last visited Jan. 31, 2024).

46.     The program began in Volusia County as a demonstration project under the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6407, 103 Stat. 2106, 2266 (1989), which required States to charge premiums to participating families with incomes between 100% and 185% of the FPL, *id.* § 6407(c)(2), 103 Stat. at 2266. By 1995, the federal funding had ended, but Florida continued its efforts and the program expanded to additional counties, funded by state, local, and private sources. Ex.5, Demonstration Report at 1–2, 62.

47.     When Congress established CHIP in 1997, it expressly grandfathered the programs in Florida, New York, and Pennsylvania into CHIP. 42 U.S.C. § 1397cc(a)(3), (d)(1). Congress permitted these States to continue operating their programs, which already provided "comprehensive . . . coverage" to children, under the auspices of CHIP. *Id.* § 1397cc(a)(3); 42 C.F.R. § 457.440(a). Congress also gave these States discretion to modify their programs within broad limits. *See* 42 U.S.C. § 1397cc(d)(2), (a)(2)(B); 42 C.F.R. § 457.440(b).

48.     Florida subsequently transferred administration of its program to "Florida KidCare," an umbrella program that oversees both Florida Medicaid and CHIP.

49.     Generally, Florida Medicaid offers no-cost health insurance to children under age 1 whose household incomes are up to 206% of the FPL, children ages 1 through 5 whose household incomes are up to 140% of the FPL, and children ages 6 through 18 whose household incomes are up to 133% of the FPL.[2] Florida CHIP offers subsidized health insurance coverage to children ages 1 through 18 who are not eligible for Medicaid and whose household incomes are up to 210% of the FPL. Ex.2, Fla. CHIP Plan, at 5, 23. As of October 2023, Florida CHIP provides subsidized health insurance coverage to more than 119,000 Florida children. Ex.1, Noll Declaration ¶ 3.[3]

50.     Children must also meet other criteria to be eligible for Florida CHIP. For example, the child must be a U.S. citizen or qualified alien, a Florida resident, and uninsured at the time of application. Ex.2, Fla. CHIP Plan at 80–84, 86.

51.     If a child is determined to meet the eligibility criteria for participation in Florida CHIP, the child's family is notified and invited to enroll the child in the program.

---

[2] Income thresholds are specified in terms of modified adjusted gross income (MAGI). 42 U.S.C. § 1396a(e)(14).
[3] Families that do not qualify for subsidies under CHIP or Medicaid are also eligible to purchase health insurance for children through Florida KidCare, but are required to pay the full premium cost. Ex.2, Fla. CHIP Plan at 5, 23, 177.

52.    Since its inception, Florida CHIP has required cost-sharing. Families who elect to enroll at least one child in the plan are required to pay a modest monthly premium to obtain insurance coverage, at a rate that scales with family income. Families with incomes up to 158% of the FPL pay a monthly premium of $15 per family, and families with incomes between 158% and 210% of the FPL pay a monthly premium of $20 per family. The monthly premiums are the same regardless of the number of children in the family enrolled. Ex.2, Fla. CHIP Plan at 22–23, 176–77.

53.    Premium payments help offset the costs of Florida CHIP. In fiscal year 2019–2020, Florida collected over $30 million in premium payments from families with children enrolled in Florida CHIP. Ex.1, Noll Declaration ¶ 4.

54.    The Florida Constitution requires balanced annual budgets. Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d). Premium payments play an important role in achieving the requirement and maintaining the long-term stability of Florida CHIP.

55.    Requiring participants to make modest contributions to the cost of health insurance also reflects a conscious policy choice by the Florida Legislature, which concluded that Florida residents are best-served when those receiving state-subsidized healthcare retain a measure accountability for, and investment in, the benefits they receive. Florida CHIP is thus a personal responsibility program, intended to bridge the gap between families with the lowest incomes, who receive no-cost health insurance through Medicaid, and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. § 409.812 (Florida KidCare provides "health benefits coverage options from which families may select coverage and through which families may

contribute financially to the health care of their children"); *id.* § 409.813 ("[C]overage under the Florida Kidcare program is not an entitlement."); Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), http://www.leg.state.fl.us/data/Publications/2000/House/reports/ interim_reports/pdf/kidcare.pdf.

56.    Since January 2005, Florida CHIP has provided 12 months of continuous eligibility for participants.[4] During the continuous eligibility period, an enrolled child remains eligible for subsidized health insurance regardless of changes in the child's circumstances (unless the child reaches age 19 or moves out of state). This means that even if the child's household income increases above 210% of the FPL during the relevant period, the child retains access to health insurance through Florida CHIP with no change in monthly premiums for 12 months, measured from the first month of coverage or the month following the date the participant completed renewal. Ex.2, Fla. CHIP Plan at 83, 91–92.

57.    Payment of monthly premiums is required to maintain enrollment in (and thus coverage under) Florida CHIP, but not to maintain underlying eligibility. A child whose family does not pay the monthly premium will be disenrolled from insurance coverage after a 30-day grace period regardless of the child's eligibility. The child can, however, reenroll after a short lock-out period without going through a new eligibility application and determination. *Id.* at 97–98. Florida has required

---

[4] From 1998 to 2005, Florida CHIP provided six months of continuous eligibility. Ex.2, Fla. CHIP Plan at 83, 91–92.

disenrollment for nonpayment of premiums since it started offering subsidized health insurance to children in 1991. Ex.5, Demonstration Report at 25; *cf.* Omnibus Budget Reconciliation Act of 1989, § 6407, 103 Stat. at 2266. And disenrollment for nonpayment of premiums is required by state law. *See* Fla. Stat. 624.91(5)(b)(9).

58.    CHIP premiums are due on the first day of the month prior to the month of coverage. Ex.2, Fla. CHIP Plan at 178. Disenrollments from Florida CHIP occur monthly and become effective on the first day of the month after the unpaid premium was due. For example, disenrollments are February 1, 2024, for participants who have not paid premiums that were due January 1, 2024. Ex.1, Noll Declaration ¶ 11.

59.    In June 2023, Governor Ron DeSantis signed into law Florida H.B. 121, which makes Florida children with household incomes up to 300% of the FPL eligible for subsidized insurance through Florida CHIP. *See* An Act Relating to Florida KidCare Program Eligibility, H.B. 121, 2023 Leg. § 1 (Fla. 2023). The increased income limit is estimated to make subsidized health insurance available to an additional 26,000 Florida children in its first full year of operation alone. *See* Ex.1, Noll Declaration ¶ 5. The expansion will be funded partially through state funds, with the remaining costs covered through the collection of premium payments and matching federal funds. Ex.1, Noll Declaration ¶ 6; *Florida H.R. Staff Final Bill Analysis: H.B. 121*, at 6–7 (June 23, 2023), https://www.flsenate.gov/Session/Bill/2023/121/Analyses/h0121z1.HRS.PDF.

60.    Under the current proposal for Florida's expanded program, premiums for those already eligible for the program would rise modestly. Families with incomes

between 133% and 175% of the federal poverty level would pay $17 per month, and families with incomes between 175% and 200% of the federal poverty level would pay $30 per month. Newly-eligible families with higher incomes would pay a higher premium, ranging from $60 to $195 per month, depending on income. *See* Fla. AHCA, *New 5-Year Section 1115 Demonstration Request* 3 (Jan. 23, 2024), https://ahca.myflorida.com/content/download/23901/file/Children%27s%20 Health%20Insurance%20Program%20Eligibility%20Extension%20Full%20Public% 20Notice%20Document.pdf.

61.    Florida anticipates collecting approximately $53 million in premium payments (from both existing and new participants) in the first full year of the expanded CHIP plan. Approximately $23.1 million of these are a result of the expanded program and help offset the cost of the expansion. Ex.1, Noll Declaration ¶¶ 6–7.

*2023 CAA*

62.    In the 2023 CAA, Congress amended the Social Security Act to make continuous eligibility mandatory for both Medicaid and CHIP. Pub. L. No. 117-328, § 5112, 136 Stat. at 5940.

63.    Specifically, Congress amended section 1902(e)(12) of the Social Security Act, 42 U.S.C. § 1396a(e)(12), applicable to Medicaid benefits, to read:

> The State plan (or waiver of such State plan) shall provide that an individual who is under the age of 19 and who is determined to be eligible for benefits under a State plan (or waiver of such plan) approved under this title under subsection (a)(10)(A) shall remain eligible for such benefits until the earlier of—

19

(A) the end of the 12-month period beginning on the date of such determination;

(B) the time that such individual attains the age of 19; or

(C) the date that such individual ceases to be a resident of such State.

2023 CAA § 5112(a), 136 Stat. at 5940.

64.    Congress then amended section 2107(e)(1) of the Social Security Act, 42 U.S.C. § 1397gg(e)(1), to specify that the Medicaid mandatory continuous eligibility provision also applies to state CHIPs. 2023 CAA § 5112(b), 136 Stat. at 5940 (adding 42 U.S.C. § 1397gg(e)(1)(K)).[5]

65.    The 2023 CAA addresses only whether a child is "eligible" for CHIP benefits. It says nothing about a child's *enrollment* in, or *coverage* under, a state CHIP.

66.    Nor does the 2023 CAA address or modify any of the statutory or regulatory provisions allowing States to require participant cost-sharing under CHIP. *See, e.g.*, 42 U.S.C. § 1397cc(e); 42 C.F.R. part 457, subpart E. Nor does it modify Congress's express allowance that States may "terminat[e]" an "individual's coverage" for "failure to make a premium payment" after a 30-day grace period. 42 U.S.C. § 1397cc(e)(3)(C). Nor does it modify 42 C.F.R. § 457.342(b), which expressly permits the termination of CHIP enrollment "during the continuous eligibility period for failure to pay required premiums or enrollment fees."

---

[5] The 2023 CAA also provides that "a targeted low-income child enrolled under the State child health plan or waiver may be transferred to the Medicaid program . . . for the remaining duration of the 12-month continuous eligibility period, if the child becomes eligible for full [Medicaid] benefits . . . during such period." 2023 CAA § 5112(b), 136 Stat. at 5940.

67.    Congress has previously considered bills that would have provided for continuous enrollment in a state CHIP. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021); Stabilize Medicaid and CHIP Coverage Act, H.R. 1738, 117th Cong. (2021). Those bills contained express language requiring that "an individual who is determined to be eligible for benefits . . . shall remain eligible *and enrolled* for such benefits" for the duration of the specified period. S. 646 § 3(b)(1) (emphasis added); H.R. 1738 § 2(b)(1) (same). Those bills have not passed, and the 2023 CAA includes no language referencing "enrollment."

***September 29, 2023, SHO Letter***

68.    On September 29, 2023, CMS issued a State Health Official letter "to provide states with guidance on implementing" the new continuous eligibility requirement in the 2023 CAA. Ex.3, SHO Letter at 1. But CMS's "guidance" is, itself, misguided.

69.    In the SHO Letter, CMS conflates "eligibility" and "enrollment," incorrectly stating that continuous eligibility "provides *coverage* to children in . . . CHIP for a full 12-month period regardless of changes in circumstances." *Id.* at 2 (emphasis added). The SHO Letter thus prohibits *disenrollment* during continuous eligibility period. *See, e.g., id.* at 8 ("States may *not* terminate coverage . . . during a [continuous eligibility] period . . . [r]ather, the child must remain eligible for coverage through the end of the 12-month period" (emphasis original)).

70.    CMS also observed that the 2023 CAA "explicitly provide[s]" only two "exception[s]" to continuous eligibility: for children who "[r]each age 19" or "[c]ease

to be state residents." *Id.* at 4. But CMS explained that States "will be expected to" continue terminating eligibility for three other reasons currently expressed in CHIP and Medicaid regulations: when eligibility is voluntarily terminated, when the agency determines eligibility was erroneously granted, or when the child dies. *Id.* at 4–5 (citing 42 C.F.R. §§ 435.926(d), 457.342(b)).

71.     According to CMS, these five circumstances are the only situations in which a State can terminate CHIP eligibility during the continuous eligibility period. *Id.* at 7, 8. States with nonconforming CHIPs "must" submit plan amendments "no later than the end of the state fiscal year in which January 1, 2024 falls." *Id.* at 14.

72.     The SHO Letter did not discuss termination of *coverage* for nonpayment of premiums, noting instead that CMS was "still assessing how non-payment of premiums intersects with [continuing eligibility] under the CAA" and indicating CMS's "inten[t] to issue separate guidance on [the] topic." *Id.* at 4 n.14.

**October 27, 2023, FAQs**

73.     On October 27, 2023, CMS issued a document labeled "Frequently Asked Questions" about continuous eligibility under the 2023 CAA. Ex.4, FAQs. Despite its title, the FAQs impose new substantive obligations on States operating CHIPs and effectively amend CMS's existing regulations.

74.     In the FAQs, CMS instructs that beginning January 1, 2024, States cannot "terminate CHIP *coverage* during a continuous eligibility . . . period due to nonpayment of premiums" (emphasis added). *Id.* at 1. As in the SHO Letter, CMS

mistakenly equates *eligibility* for CHIP benefits with *coverage* under—and thus *enrollment* in—a state CHIP.

75.    CMS further reasons that because "[t]here is not an exception to [continuous eligibility] for nonpayment of premiums" under the 2023 CAA, "the existing regulatory option at 42 CFR § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception to [continuous eligibility] will end on December 31, 2023." Ex.4, FAQs at 1. "States that have already adopted [continuous eligibility] for children and treat nonpayment of premiums as an exception to [continuous eligibility] in CHIP will need to submit a CHIP [state plan amendment] as outlined in ... [the] SHO Letter." *Id.*

76.    Moreover, CMS continues that States must "absorb the costs of unpaid premiums," as those costs are not eligible for federal reimbursement. *Id.* at 2.

77.    CMS, however, insists that five regulatory reasons for terminating eligibility remain operable. *See* 42 C.F.R. §§ 435.926(d), 457.342(b). Two of those— aging out or moving out-of-state—are expressly included in the 2023 CAA. Ex.4, FAQs at 1. CMS justifies retaining the other three—when the child dies, "requests disenrollment,"[6] or eligibility was erroneously granted—because they "do not

---

[6] While 42 C.F.R. § 435.926(d)(2) permits termination of "eligibility" during the continuous eligibility period whenever "[t]he child or child's representative requests a voluntary *termination of eligibility*" (emphasis added), the FAQs permit States to "terminate *coverage*" whenever "the child or their representative requests *disenrollment*," Ex.4, FAQs at 1 (emphases added), again conflating "eligibility" with "enrollment."

undermine the [continuous eligibility] mandate . . . and are important to protecting program integrity." *Id.*

78.   But CMS does not explain how allowing termination of coverage (i.e., disenrollment)—not termination of *eligibility*—based on premium nonpayment undermines the 2023 CAA's continuous eligibility requirement. Nor does CMS explain why allowing disenrollment for nonpayment of premiums is not important for program integrity.

***Florida's CHIP Expansion Threatened***

79.   In October 2023, CMS informed Florida that it could not obtain approval for Florida's expanded CHIP—including the new premium tiers—through a conventional plan amendment, but would need to apply for a waiver under section 1115 of the Social Security Act, 42 U.S.C. § 1315(a). At the same time, CMS informed Florida that it would need to submit an amendment modifying Florida CHIP to conform with the SHO Letter and FAQs.

80.   CMS indicated that it would not approve Florida's proposed expansion without accompanying modifications to Florida CHIP's continuous eligibility provisions, namely, the provisions that allow the State to disenroll an eligible child for nonpayment of premiums during the continuous eligibility period.

81.   On January 23, 2024, Florida posted for public review and input their application for a section 1115 waiver for the expanded Florida CHIP plan. *See New 5-Year Section 1115 Demonstration Request*, *supra*.

*Secretary Becerra's December 18, 2023, Letter to Governor DeSantis*

82.    On December 18, 2023, Secretary Becerra sent a letter to Governor DeSantis, discussing trends in Medicaid and CHIP enrollment and "urg[ing]" Governor DeSantis "to ensure that no child in [Florida] who still meets eligibility criteria for Medicaid or CHIP loses their health coverage due to 'red tape' or other avoidable reasons." Ex.6, Letter from Secretary Becerra to Governor DeSantis (Dec. 18, 2023) ("Becerra Letter") at 1.

83.    Secretary Becerra's letter listed several recommended "proactive actions to prevent eligible children from losing Medicaid and CHIP," and closed with a suggestion to "[e]xpand Medicaid." *Id.* at 1–2.

84.    The letter also included the ominous warning that "HHS takes its oversight and monitoring role . . . extremely seriously and will not hesitate to take action to ensure states' compliance with federal Medicaid requirements." *Id.* at 1.

*The FAQs Undermine the Integrity and Sustainability of Florida CHIP*

85.    The FAQs impose a continuous enrollment requirement that requires Florida to administer its CHIP without the cost-sharing that Florida deems critical to its program and that has been expressly allowed by Congress.

86.    The FAQs allow eligible children to obtain health insurance for a full 12 months—the duration of the continuous eligibility period—by enrolling and paying the first month's premium only. 42 C.F.R. §§ 435.916(a), 457.343. The same scenario can then repeat following the next eligibility determination, and the next, and so on.

87.    Under the FAQs, there is no consequence for failing to pay premiums, severely diminishing the incentive of participants to make any premium payment after the first month. As a result, widespread nonpayment is a reasonable expectation. Florida's revenue from premium collection could therefore drop by eleven-twelfths (91.67%), which would mean a loss of more than $27.5 million annually under Florida's current program, and an anticipated loss of more than $48.5 million in the first year under an expanded program. *See* Ex.1, Noll Declaration ¶¶ 4, 7. According to CMS, these sums are not federally reimbursable, forcing Florida to assume the losses. Ex.4, FAQs at 2.

88.    Florida anticipates that compliance with the FAQs will cost approximately $1 million each month to provide benefits to CHIP participants who should have been disenrolled. Ex.1, Noll Declaration ¶ 10.

89.    Forcing Florida to comply with the FAQs will also impact the planned expansion of the program, preventing thousands of Florida children from accessing health insurance coverage.

90.    The FAQs amount to a backdoor expansion of no-cost health insurance coverage. Although entitlement programs may be the Biden Administration's preferred policy, *see* Ex.6, Becerra Letter at 2 (suggesting Florida "dramatically reduce barriers for families to enroll their children in coverage, including eliminating CHIP premiums" or "[e]xpand Medicaid"), Congress disagreed. *See* 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan.").

26

91.    Florida disagrees, too. Fla. Stat. § 409.813 ("coverage under the Florida KidCare program is not an entitlement"); *see also id.* § 409.812. And under the federal CHIP framework, it is Florida's preferred policy that matters. *See, e.g.,* 42 U.S.C. § 1397gg(a) (permitting State to "identify specific strategic objectives" and "performance goals" for CHIP plan); *id.* § 1397ff(d) (providing for "withholding of funds" only "in the case of substantial noncompliance" with "the requirements of" Title XXI).

92.    Florida's approach has been expressly authorized by Congress. Under Title XXI, Congress has recognized that States may "impos[e]" "charges" on CHIP participants for health insurance coverage, including "premiums, deductibles, [and] coinsurance." 42 U.S.C. § 1397cc(e)(1)(A). And Congress has allowed States to "terminat[e]" an enrollee's "coverage under the plan" for "failure to make a premium payment" after a grace period. *Id.* § 1397cc(e)(3)(C)(i). Florida's approach is also authorized by 42 C.F.R. § 457.342(b), which the FAQs purport to "end," Ex.4, FAQs at 1.

93.    The 2023 CAA does not impose a continuous enrollment requirement. By its plain terms, the 2023 CAA requires continuous *eligibility* for CHIP benefits, not continuous *enrollment* in a CHIP plan. Florida CHIP provides what the 2023 CAA requires: Once a child is determined to be eligible for CHIP benefits, the child remains eligible for those benefits for an entire year. And if the child is disenrolled for nonpayment of premiums, the child can reenroll during the continuous eligibility period without a new eligibility determination.

94.     The FAQs are unlawful. They must be enjoined and set aside.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Violation of the APA: Contrary to Law)

95.     The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

96.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     The FAQs contradict Congress's express allowance for States to terminate coverage for nonpayment of premiums in section 2103(e)(3)(C) of the Social Security Act, 42 U.S.C. § 1397cc(e)(3)(C) (allowing States to "terminat[e]" an enrollee's "coverage" for nonpayment after a 30-day grace period). Under the FAQs, States have no opportunity to "terminat[e] . . . coverage." *Id.* They thus violate 42 U.S.C. § 1397cc(e)(3)(C) or otherwise render it a dead letter, contravening "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up).

98.     The FAQs also violate CMS's own operative regulations, which expressly permit States to terminate a participant's coverage "during the continuous eligibility period for failure to pay required premiums." 42 C.F.R. § 457.342(b). "So long as this regulation is extant it has the force of law." *United States v. Nixon*, 418 U.S. 683, 695 (1974). CMS has not amended or rescinded 42 C.F.R. § 457.342(b) through

notice-and-comment, nor can it simply "end" the provision by fiat in an FAQs. "So long as this regulation remains in force [CMS is bound by it[.]" *Nixon*, 418 U.S. at 696.

99.    The FAQs are also contrary to law because they fail to provide for plans, like Florida's, that are grandfathered into CHIP. States with grandfathered programs are permitted to maintain their existing CHIPs and have discretion to modify those programs within broad limits. 42 U.S.C. § 1397cc(a)(3), (d).

100.    Since its inception, Florida CHIP has permitted disenrollment for nonpayment of premiums, including during continuous eligibility periods. The FAQs prevent Florida from exercising its authority under the grandfathering provisions of Title XXI to maintain its existing CHIP, including disenrolling participants for nonpayment of premiums.

## COUNT TWO

### (Violation of the APA: Excess of Statutory Authority)

101.    The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

102.    The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

103.    CMS has no authority to impose a continuous enrollment requirement. The 2023 CAA provides only that a child "who is determined to be *eligible* for benefits under" a state CHIP "shall remain *eligible* for such benefits" for 12 months, unless the

child first reaches age 19 or ceases to be a state resident. 2023 CAA § 5112(a), (b), 136 Stat. at 5940 (emphases added).

104.   A child is *eligible* for CHIP benefits if the child meets the relevant state-established criteria. 42 U.S.C. § 1397bb(b)(1). For Florida CHIP, eligibility criteria include having a household income under 210% of the federal poverty level, being a U.S. citizen or qualified alien, being a Florida resident, and being uninsured. Ex.2, Fla. CHIP Plan at 5, 80–84, 86, 177. Florida's eligibility criteria do not include any standard related to payment of premiums.

105.   Children determined *eligible* for CHIP benefits are then offered the option to *enroll* in CHIP and obtain health insurance *coverage*. Enrollment may require an eligible child's family to take additional actions, for example, paying an enrollment fee and monthly premiums. *See, e.g.,* 42 C.F.R. § 457.510 (discussing, among other permissible charges, "enrollment fees").

106.   Title XXI consistently distinguishes eligibility from enrollment. *See, e.g.,* 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals); *id.* § 1397hh(c)(3) ("enrollees, disenrollees, and individuals eligible for but not enrolled" in a CHIP plan); *id.* § 1397mm(a)(1) ("efforts . . . to increase the enrollment . . . of eligible children"); *id.* § 1397mm(h)(1) ("campaigns to link the eligibility and enrollment systems"); *id.* § 1397mm(h)(6) ("enrollment . . . strategies for eligible children").

107.   CMS regulations do the same. *See, e.g.,* 42 C.F.R. § 457.10 (discussing information in an "eligibility notice," including the potential impact of a

"determination of eligibility for, or enrollment in, another insurance affordability program"); *id.* § 457.60 ("[e]ligibilty standards, enrollment caps, and disenrollment policies"); *id.* § 457.300 ("[r]egulations relat[ed] to eligibility, screening, applications and enrollment"); *id.* § 457.350(i)(2)(ii)(A) ("the date on which the individual will be eligible to enroll"); *id.* § 457.525(b) (cost-sharing information must be made available to "[e]nrollees, at the time of enrollment and reenrollment after a redetermination of eligibility"); *id.* § 457.570(b) (adjustment to a "child's cost-sharing category" if "the enrollee may have become eligible ... for a lower level of cost sharing").

108.   Had Congress intended to require continuous enrollment in a state CHIP, it would have said so, as has been done in proposed but unenacted bills. *See* S. 646 § 3(b)(1) (requiring that "an individual who is determined to be eligible for benefits . . . shall remain eligible *and enrolled* for such benefits" for the duration of the specified period (emphasis added)); H.R. 1738 § 2(b)(1) (same).

109.   Nor is there is any inherent conflict in requiring continuous eligibility for CHIP while permitting disenrollment for failure to pay premiums. A participant may remain eligible for CHIP benefits even if the participant is not presently enrolled in a CHIP plan for whatever reason. During the continuous eligibility period, a participant disenrolled from a plan for nonpayment of premiums can reenroll without applying again for an eligibility determination—the participant remains "eligible" for CHIP benefits, but simply is not enrolled if the modest premium requirements are not satisfied.

110.   Indeed, CMS has long recognized by regulation that continuous eligibility and disenrollment for nonpayment of premiums comfortably co-exist. *See* 42 C.F.R. § 457.342(b) (permitting termination for nonpayment of premium during the continuous eligibility period). And Florida has successfully implemented both for decades.

111.   To the extent that there is any discernible tension between the 2023 CAA's continuous eligibility requirement and the allowance for termination of coverage for nonpayment of premiums under 42 U.S.C. § 1397cc(e)(3)(C), the specific provisions about disenrollment for nonpayment of premiums must govern. *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002) (explaining that "specific statutory language. . . control[s] more general language when there is a conflict between the two").

112.   By its plain language, the 2023 CAA unambiguously requires that a child "remain eligible for [CHIP] benefits," not that the child remain enrolled in a CHIP. 2023 CAA § 5112(a), 136 Stat. at 5940. CMS "must give effect to that clear intent." *In re Gateway Radiology Consultants*, 983 F.3d at 1256. CMS's attempt to impose a continuous enrollment requirement thus exceeds the agency's authority.

113.   It is irrelevant that CMS believes a continuous enrollment requirement may be more beneficial. *See* Ex.3, SHO Letter at 2. "[P]olicy considerations cannot create an ambiguity when the words on the page are clear." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018). The 2023 CAA is clear: States must provide continuous *eligibility*. The 2023 CAA says nothing about *enrollment* or *coverage*.

114.   Failure to account in the FAQs for existing plans, like Florida's, that are grandfathered into the federal CHIP program also exceeds CMS's authority. *See* 42 U.S.C. § 1397cc(a)(3), (d).

## COUNT THREE

### (Violation of the APA: Arbitrary or Capricious)

115.   The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

116.   The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, [or] capricious." 5 U.S.C. § 706(2)(A). Agency actions thus must be "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

117.   CMS observes that the 2023 CAA "provide[s] for limited exceptions" to the continuous eligibility requirement, namely "the child turning age 19, no longer being a state resident or, in the case of a child enrolled in a separate CHIP, becoming eligible for Medicaid." Ex.4, FAQs at 1. Because "[t]here is not an exception to [continuous eligibility] for non-payment of premiums," CMS asserts that the "existing regulatory option" for termination of enrollment for nonpayment does not survive. *Id.*

118.   It is logically inconsistent for CMS to permit three other "exceptions" to terminating eligibility—when the child dies, the child (or the child's representative) requests termination, or the agency determines eligibility was erroneously granted— none of which are provided for in the 2023 CAA. *Id.*; *see also* Ex.3, SHO Letter at 4–5. The 2023 CAA either forecloses non-statutory exceptions or it does not.

119.   The same justification that CMS offers for its preferred exceptions—that they "do not undermine the [continuous eligibility] mandate . . . and are important to protecting program integrity," Ex.4, FAQs at 1—also applies to allowing disenrollment for nonpayment of premiums. As explained above, such disenrollment does not affect eligibility for CHIP benefits. And allowing disenrollment is crucial to maintaining the integrity and long-term sustainability of programs, like Florida's, that incorporate cost-sharing as a fundamental component of their CHIPs.

120.   Moreover, "[w]hen an agency changes its existing position" it "must at least display awareness that it is changing position," "show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 221–22 (cleaned up). "[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 222.

121.   CMS completely ignores the distinction between eligibility and enrollment, including that continuous eligibility and disenrollment for nonpayment of premiums have co-existed in its regulations for nearly a decade. *See* 42 C.F.R. § 457.342(b). CMS does not explain why it elides this distinction and has reversed its long-held position that disenrollment for nonpayment is compatible with continuous eligibility. "This lack of reasoned explication for a regulation that is inconsistent with [CMS's] longstanding earlier position," is reason for the court to set aside the FAQs. *Encino Motorcars*, 579 U.S. at 224.

122.   CMS has also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. CMS never considered the authority granted to States, like Florida, whose plans were grandfathered into the CHIP program. Under Title XXI, these States are permitted to continue operating their existing plans and have discretion to modify those plans within broad limits. 42 U.S.C. § 1397cc(a)(3), (d). Neither the SHO Letter nor the FAQs acknowledge or account for this authority.

123.   CMS similarly failed to consider that States have relied on their authority to terminate coverage for nonpayment when implementing and expanding their CHIPs. Florida, in particular, has significant reliance interests because it recently enacted legislation expanding the state CHIP to offer subsidized coverage to more children. This was based on the expectation that the expansion will be partially funded through premium payments. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra,* at 6–7. "When an agency changes course," it is "arbitrary and capricious to ignore [reliance interests]." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up).

## COUNT FOUR

### (Violation of the APA: Without Observance of Required Procedure)

124.   The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

125.   The APA requires agencies to provide "notice" of an intended rulemaking and "give interested persons an opportunity to participate in the rule making," typically through a comment process. 5 U.S.C. § 553(b), (c).

126.   The APA's notice-and-comment requirements apply to, among others, actions that "effectively amen[d] a prior legislative rule," *Am. Mining Cong.*, 995 F.2d at 1112. The requirements also apply to actions that "create new law, rights or duties" or "have effects *completely independent* of the statute." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (cleaned up).

127.   The FAQs are agency action subject to APA's notice-and-comment requirements because they purport to "end" 42 C.F.R. § 457.342(b), Ex.4, FAQs at 1, which is, itself, a legislative rule promulgated after notice-and-comment, *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016).

128.   The FAQs are also subject to notice-and-comment because their requirement that States guarantee enrollment for the duration of the continuous eligibility period is a "new . . . dut[y]" on States, whose "effect[t] [is] *completely independent* of the statute." *Warshauer*, 577 F.3d at 1337 (cleaned up)

129.   CMS issued the FAQs to effectively amend its regulations and impose a continuous enrollment requirement without notice and without providing interested parties opportunity to comment, as required by the APA.

## COUNT FIVE

### (Declaratory Judgment)

130.   The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

131.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

132.    For the same reasons described in Counts 1 through 4, Florida is entitled to a declaratory judgment that the FAQs are contrary to law, in excess of statutory authority, arbitrary and capricious, and without observance of procedure required by law, and thus do not bind or otherwise limit Florida.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.    Declare that the FAQs are unlawful, in violation of 5 U.S.C. §§ 553 and 706(2)(A), (C), (D); 42 U.S.C. § 1397gg(e)(1)(K), as amended by 2023 CAA § 5112(b), 136 Stat. at 5940; 42 U.S.C. § 1397cc(a)(3), (d), (e)(3)(C); and 42 C.F.R. § 457.342(b).

B.    Vacate and set aside the FAQs, as required by 5 U.S.C. § 706(2).

C.    Enjoin Defendants from enforcing the FAQs, including but not limited to disapproving a state CHIP plan amendment, denying a CHIP waiver, or initiating a non-compliance finding or corrective action plan based on the FAQs.

D.    Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

E.    Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Dated: February 1, 2024

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Natalie Christmas*
Natalie Christmas (FBN 1019180)*
COUNSELOR TO THE ATTORNEY
  GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

*\* Lead Counsel*
*Counsel for the State of Florida*

*/s/ R. Trent McCotter*
R. Trent McCotter (*pro hac vice forthcoming*)*
Jared M. Kelson (*pro hac vice forthcoming*)
Laura B. Ruppalt (*pro hac vice forthcoming*)
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

ANDREW T. SHEERAN
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*\* Lead Counsel*
*Counsel for Agency for Health Care*
  *Administration*