## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| STATE OF FLORIDA, et al.,<br><br>             Plaintiffs,<br><br>       v.<br><br>CENTERS FOR MEDICARE &<br>MEDICAID SERVICES, et al.,<br><br>           Defendants. | No. 8:24-cv-317-WFJ-AAS |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

I.      The Medicaid and CHIP Programs ................................................... 3

II.     Continuous Eligibility in State Medicaid and CHIP Plans ............ 4

        A.      Prior Law ............................................................................... 4

        B.      The Consolidated Appropriations Act, 2023 ...................... 5

        C.      The Challenged Guidance ..................................................... 6

III.    This Case .............................................................................................. 7

LEGAL STANDARD ........................................................................................ 7

ARGUMENT ..................................................................................................... 8

I.      This Court lacks jurisdiction to hear this case. ............................... 8

        A.      Florida's claim is not ripe for judicial review. .................... 8

        B.      This Court lacks jurisdiction under the CHIP statute. ....... 13

II.     Florida does not face irreparable harm. ......................................... 16

III.    Florida is unlikely to succeed on the merits. ................................. 19

        A.      The FAQs properly interpret the CAA's amendments to CHIP. ......... 19

        B.      CMS's interpretation of the CAA is not arbitrary and capricious. ....... 25

        C.      The FAQs constitute an interpretive rule exempted from the APA's rulemaking requirements. ...................................... 27

IV.     The equities and the public interest weigh against injunctive relief. .............. 28

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ...................................................................9, 12

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) .......................................................18

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ....................................................................19

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
  263 F.3d 1297 (11th Cir. 2001) ...................................................8

*De La Fuente v. Kemp*,
  679 F. App'x 932 (11th Cir. 2017) .............................................17

*Dismas Charities, Inc. v. U.S. Dep't of Just.*,
  401 F.3d 666 (6th Cir. 2005) .......................................................28

*Doe v. Fed. Aviation Admin.*,
  432 F.3d 1259 (11th Cir. 2005) .............................................14, 15

*Duarte v. Mayorkas*,
  27 F.4th 1044 (5th Cir. 2022) ......................................................22

*Elend v. Basham*,
  471 F.3d 1199 (11th Cir. 2006) ...................................................9

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ...................................................................14, 16

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ....................................................................24

*Florida v. HHS*,
  19 F.4th 1271 (11th Cir. 2021) ....................................................19

*Flowers Indus. v. FTC*,
  849 F.2d 551 (11th Cir. 1988) .....................................................13

*Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) .....................................................29

*Gonzalez v. McNary,*
    980 F.2d 1418 (11th Cir. 1993) ........................................................................23

*Great Plains Coop v. Commodity Futures Trading Comm'n,*
    205 F.3d 353 (8th Cir. 2000) ..........................................................................15

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ........................................................................................19

*Ipharmacy v. Mukasey,*
    268 F. App'x 876 (11th Cir. 2008) ....................................................................9

*Jean v. Nelson,*
    711 F.2d 1455 (11th Cir. 1983) ........................................................................13

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ........................................................................................22

*La. Env't Action Network v. U.S. EPA,*
    382 F.3d 575 (5th Cir. 2004) ..........................................................................26

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..........................................................................................9

*Metropolitan Sch. Dist. v. Davila,*
    969 F.2d 485 (7th Cir. 1992) ..........................................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ..........................................................................................26

*Nat'l Advert. Co. v. City of Miami,*
    402 F.3d 1335 (11th Cir. 2005) ......................................................................10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ....................................................................................9, 13

*New Jersey v. HHS,*
    670 F.2d 1262 (3d Cir. 1981) ..........................................................................16

*New Jersey v. U.S. Dep't of Health & Hum. Servs.,*
    2008 WL 4936933 (D.N.J. Nov. 17, 2008)..........................................8, 11, 12, 19

*New York v. U.S. Dep't of Health & Hum. Servs.,*
    2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) ...............................................*passim*

iii

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) .................................................................................9, 13

*Orengo Caraballo v. Reich*,
   11 F.3d 186 (D.C. Cir. 1993) ...........................................................27

*Pittman v. Cole*,
   267 F.3d 1269 (11th Cir. 2001) ........................................................9

*Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*,
   736 F.2d 19 (2d Cir. 1984) ...............................................................12

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995)...........................................................................28

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ........................................................17

*St. Marie v. Ludeman*,
   2010 WL 924420 (D. Minn. Mar. 11, 2010) ......................................18

*Tennessee v. U.S. Dep't of State*,
   329 F. Supp. 3d 597 (W.D. Tenn. 2018), *aff'd*,
   931 F.3d 499 (6th Cir. 2019)............................................8, 12, 14, 16

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)...................................................................14, 15

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)...........................................................................23

*United States v. Castro*,
   837 F.2d 441 (11th Cir. 1988) .........................................................22

*United States v. Jefferson Cnty.*,
   720 F.2d 1511 (11th Cir. 1983) ........................................................8

*United States v. Oakland Cannabis Buyers' Coop.*,
   532 U.S. 483 (2001).........................................................................29

*Warshauer v. Solis*,
   577 F.3d 1330 (11th Cir. 2009) ..................................................27, 28

*West Virginia v. Thompson*,
   475 F.3d 204 (4th Ci. 2007) ............................................................16

iv

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................... 7, 17

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ...........................................18

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  141 S. Ct. 2434 (2021) ..........................................................23

**FEDERAL STATUTES**

5 U.S.C. § 553 .............................................................................27

30 U.S.C. § 816 ...........................................................................15

42 U.S.C. § 1315 ..........................................................................11

42 U.S.C. § 1316 .......................................................10, 11, 13, 15

42 U.S.C. §§ 1396 *et seq.* ...........................................................3

42 U.S.C. § 1396a .........................................................................3

42 U.S.C. § 1396a (2022) ................................................. 4, 20, 21

42 U.S.C. §§ 1397aa *et seq.* .......................................................3

42 U.S.C. § 1397aa ......................................................................3

42 U.S.C. § 1397bb ......................................................................3

42 U.S.C. § 1397cc ...........................................................24, 25, 27

42 U.S.C. § 1397ff .......................................................................10

42 U.S.C. § 1397gg .............................................................*passim*

42 U.S.C. § 1397jj ........................................................................3

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ......................*passim*

**STATE STATUTES**

Fla. Stat. § 624.91 ......................................................................18

v

## REGULATIONS

42 C.F.R. § 435.916 ........................................................................................23

42 C.F.R. § 435.926 ...........................................................................4, 5, 20, 26

42 C.F.R. § 435.930 ............................................................................. 4, 20, 22

42 C.F.R. § 457.50 .............................................................................................3

42 C.F.R. § 457.60 ...........................................................................................10

42 C.F.R. §§ 457.80-457.140 ............................................................................3

42 C.F.R. § 457.160 .........................................................................................10

42 C.F.R. § 457.203 ................................................................................... 10, 11

42 C.F.R. § 457.204 ................................................................................... 10, 11

42 C.F.R. § 457.206 .........................................................................................10

42 C.F.R. § 457.208 ................................................................................... 11, 13

42 C.F.R. § 457.342 ................................................................................ 5, 7, 20

## OTHER AUTHORITIES

Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021),
    Congress.gov,
    https://www.congress.gov/bill/117th-congress/senate-bill/646/
    all-actions?overview=closed&s=5&r=20&q=%7B%22search%22%3A%22S.
    +646%22%7D#tabs ..........................................................................................23

**INTRODUCTION**

The Children's Health Insurance Program ("CHIP") is a cooperative federal-state program enacted to expand health insurance coverage to low-income children whose families' incomes are too low to buy private insurance but too high to qualify for Medicaid. To receive federal funding under CHIP, a state must have a state plan that meets federal requirements. When a state plan is in "substantial noncompliance" with those requirements, the Centers for Medicare & Medicaid Services ("CMS") may withhold federal funding, but only after an extensive administrative process. And any judicial review of such a finding must take place in the Courts of Appeals.

Previously, federal law provided that states "may" include in their Medicaid and CHIP plans a period of "continuous eligibility," during which a child's coverage generally may not be terminated, subject to certain exceptions. While Medicaid has never permitted states to terminate coverage for nonpayment of premiums during a period of continuous eligibility, in 2016, CMS created a regulatory exemption to allow for such terminations in the CHIP program. In the Consolidated Appropriations Act, 2023 ("CAA"), Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022), Congress changed this scheme in two fundamental ways. First, it provided that states "shall" provide for continuous eligibility in both their Medicaid and CHIP plans, something that had previously been optional. Second, it provided that the continuous eligibility requirement "shall" apply to CHIP "in the same manner" as it does to Medicaid, meaning that the prior, CHIP-specific regulatory exception could not survive. These changes were intended to reduce "churn"—cycles of termination and reenrollment

that increase administrative costs and cause coverage lapses for vulnerable children.

The CMS guidance at issue here—a set of FAQs—simply sets out this understanding of the statute, and it is both correct and procedurally sound. But the Court need not reach the merits of those issues, as Florida's preliminary injunction motion fails for more fundamental reasons. To start, the State's claims are not ripe. Florida in essence asks the Court to enjoin CMS from withholding CHIP funding or taking other corrective action based on the interpretation set out in the FAQs. But the CHIP statute and its regulations set forth a lengthy administrative process that would have to take place before CMS could do any such thing—a process that has not even begun. And even if that process had run its course, the Court would lack jurisdiction for an additional reason, because judicial review of issues concerning state plans that do not comply with federal requirements is confined to the Courts of Appeals.

Even if there were jurisdiction, Florida fails to show that the Court should exercise its emergency equitable powers to upend the ordinary administrative process. The State identifies no irreparable harm that would be forestalled by an injunction at this time. Its claimed injury is fundamentally monetary—a hypothetical withholding of federal funding—and hardly imminent, given the absence of any administrative proceedings. Florida's delay in seeking emergency relief—more than three months have passed since the FAQs were issued—also belies the notion that judicial intervention is urgently needed. And the equities and public interest tilt decidedly against an injunction, which would not only circumvent the careful administrative

2

scheme that Congress prescribed but will leave low-income children without medical coverage. Florida's motion for a preliminary injunction should be denied.

## BACKGROUND

### I.    The Medicaid and CHIP Programs

Medicaid, enacted in 1965 as Title XIX of the Social Security Act, is a cooperative federal-state program in which the federal government makes payments to states to assist them in providing medical assistance to certain low-income individuals. 42 U.S.C. §§ 1396 *et seq*. To participate in the Medicaid program, a State must submit a plan for medical assistance for approval by the Secretary of Health and Human Services. *Id.* § 1396a(b). A State plan defines the categories of individuals that can receive benefits and the specific kinds of services the State covers as medical assistance for each category. *Id*. § 1396a(a)(10), (a)(17).

In 1997, Congress created CHIP under Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa *et seq*. CHIP provides federal funds to enable states to expand health insurance coverage to uninsured children whose families' incomes are too high to qualify for Medicaid. *See id.* § 1397jj. Like Medicaid, a state must have an approved state plan to receive federal funding under CHIP. *Id.* § 1397aa(b); 42 C.F.R. § 457.50. Each plan must meet certain federal requirements. *See* 42 U.S.C. § 1397bb; *see also* 42 C.F.R. §§ 457.80-457.140.

## II.     Continuous Eligibility in State Medicaid and CHIP Plans

### A.     Prior Law

Under prior law, the Medicaid statute gave states the option to include in their state plans a "continuous eligibility" period of up to 12 months for children under 19. 42 U.S.C. § 1396a(e)(12) (2022). During this period, a child "determined to be eligible for benefits under" a state plan generally had to remain "eligible for those benefits." *Id*.

In 2016, CMS promulgated a regulation implementing this section of the Medicaid statute. *See* 42 C.F.R. § 435.926. The regulation specified that "[a] child's [Medicaid] eligibility may not be terminated during a continuous eligibility period, regardless of any changes in circumstances, unless" one of five exceptions was met: "(1) The child attains the maximum age specified in accordance with paragraph (b)(1) of this section; (2) The child or child's representative requests a voluntary termination of eligibility; (3) The child ceases to be a resident of the State; (4) The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or (5) The child dies." *Id*. § 435.926(d). Notably, this regulation did not permit termination of Medicaid coverage for nonpayment of premiums during periods of continuous eligibility, consistent with preexisting Medicaid regulations. *See id*. § 435.930(b) (providing that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until

4

they are found to be ineligible").

At the same time, CMS also issued a regulation permitting states to include a similar period of continuous eligibility in their CHIP plans. *Id*. § 457.342. This regulation stated that, "[i]n addition to the reasons provided at § 435.926(d) of this chapter"—that is, the five exceptions set forth above permitting termination of Medicaid eligibility—an additional exception applied in the CHIP context, where "a child may be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees required under the State plan," *id*. § 457.342(b). This exception did not apply to Medicaid—it was unique to CHIP.

### B.   The Consolidated Appropriations Act, 2023

On December 29, 2022, Congress enacted the CAA. Pub. L. No. 117-328, 136 Stat. 4459 (2022). The CAA made two fundamental changes relevant here. First, it amended Section 1902(e)(12) of the Medicaid statute to provide that State plans "shall" include a 12-month continuous eligibility period, which had previously been optional. *See id*. § 5112(a). Second, it amended the CHIP statute to incorporate this Medicaid continuous eligibility requirement by reference. *Id*. § 5112(b). As a result, the CHIP statute now reads that Section 1902(e)(12) of the Medicaid statute, as amended by Section 5112(a) of the CAA, "shall apply to States under this subchapter [i.e., CHIP] in the same manner as [it] appl[ies] to a State under subchapter XIX [i.e., Medicaid]." 42 U.S.C. § 1397gg(e)(1)(K). The sole exception to this "in the same manner" directive is that CHIP coverage may end if a child "becomes eligible for full

5

benefits" and is "transferred to the [state's] Medicaid program . . . for the remaining duration of the 12-month continuous eligibility period." CAA § 5112(b).

### C.     The Challenged Guidance

On September 29, 2023, CMS issued a "State Health Official" Letter addressing the CAA's changes to the continuing eligibility requirement. *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot.") Ex. 3, ECF No. 2-3 ("SHO Letter"). The SHO Letter explained that the CAA "amended section 1902(e)(12)" of the Medicaid statute to "require one year of [continuous eligibility] under the state plan . . . for children under age 19," and "added a new paragraph (K) to section 2107(e)(1)" of the CHIP statute that, "through cross reference to section  1902(e)(12)" of the Medicaid statute, applied the same continuing eligibility requirement—with the same exceptions—to CHIP. SHO Letter at 4.

The SHO Letter also discussed the importance of the continuing eligibility period for children in Medicaid and CHIP, which has been shown to "improv[e] short- and long-term health status" of children as well as "reduce financial barriers to care for low-income families, promote health equity, and provide states with better tools to hold health plans accountable for quality care and improved health outcomes." *Id.* at 2. The SHO Letter noted that CMS was "still assessing how non-payment of premiums intersects with [continuous eligibility]" in light of the CAA. *Id.* at 4 n.14.

On October 27, 2023, CMS issued FAQs that addressed whether states may "terminate CHIP coverage during a continuous eligibility (CE) period due to non-

payment of premiums." *See* Pls.' Mot. Ex. 4 at 1, ECF No. 2-4 ("FAQs"). The FAQs set forth CMS's understanding of the effect of the CAA's amendments to the Medicaid and CHIP statutes. In short, because the CAA imposed the same continuing eligibility requirement in both "[s]ections 1902(e)(12) and 2107(e)(1)(K) of the Social Security Act"—i.e., in Medicaid and CHIP—and did "not" incorporate the previous CHIP-specific "exception to [continuous eligibility] for non-payment of premiums," the "existing regulatory option at 42 C.F.R. § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception" could not survive. *Id.*

## III.   This Case

More than three months after the FAQs were issued, Florida (and its state CHIP agency) filed a complaint and preliminary injunction motion. *See* Compl., ECF No. 1; Pls.' Mot., ECF No. 2. Florida contends that its existing CHIP state plan is inconsistent with the interpretation reflected in the FAQs, and that changes to state law will require it to submit a state plan amendment that is also inconsistent with that interpretation. *See, e.g.*, *id.* at 10, 22-24. In its preliminary injunction motion, Florida seeks to "enjoin CMS from enforcing the FAQs" on the grounds that they contradict the CHIP statute and are procedurally infirm under the Administrative Procedure Act. *Id.* at 25.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To

7

justify this "drastic remedy," the movants must "clearly establish[]" (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (citation omitted). Florida bears the burden of persuasion on each element. *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). Florida has not met any of the factors and its motion should be denied.

## ARGUMENT

### I.    This Court lacks jurisdiction to hear this case.

#### A.    Florida's claim is not ripe for judicial review.

Florida's claim fails at the threshold because it is unripe. CMS has neither disapproved a proposed state plan amendment—which Florida has not even submitted yet—nor taken any action to find Florida's existing plan to be noncompliant, whether for the reasons addressed in the FAQs or otherwise. Two courts have already held that similar challenges to a CHIP SHO Letter were not ripe. *New Jersey v. U.S. Dep't of Health & Hum. Servs.*, 2008 WL 4936933 (D.N.J. Nov. 17, 2008); *New York v. U.S. Dep't of Health & Hum. Servs.*, 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008); *see also Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 617 (W.D. Tenn. 2018), *aff'd*, 931 F.3d 499 (6th Cir. 2019) (holding unripe challenge to federal requirement for Medicaid, which has nearly identical administrative process). Like those courts found, in the absence of a final agency determination adversely affecting Florida in a concrete way, judicial

review is premature.

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08 (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Ipharmacy v. Mukasey*, 268 F. App'x 876, 878 (11th Cir. 2008).

To determine whether an agency action is ripe, courts evaluate two factors: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967); *see also Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006). This requires an assessment of (1) "whether judicial intervention would inappropriately interfere with further administrative action;" (2) "whether the courts would benefit from further factual development of the issues presented;" and (3) "whether delayed review would cause hardship to the plaintiffs." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001).

Here, judicial intervention would interfere with the carefully prescribed administrative review process that must occur before CMS could take any enforcement

action in the first place. *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339-40 (11th Cir. 2005) (concluding case was not ripe because plaintiff never properly pursued its claim through the administrative process made available by city ordinance). Under the CHIP statute and regulations, when a state amends its state plan, that plan is considered approved unless CMS notifies the state within 90 days that it is disapproved or that additional information is needed. 42 U.S.C. § 1397ff(c); 42 C.F.R. § 457.160(b). Any state "dissatisfied" with CMS's disapproval of a state plan amendment may request reconsideration and is entitled to a hearing. 42 U.S.C. § 1316(a)(2); 42 C.F.R. § 457.203(a).

The CHIP statute and regulations also provide for a separate administrative process that must occur before an existing state plan is deemed to be in noncompliance with federal requirements. *See* 42 C.F.R. §§ 457.204, 457.60(a). Before CMS could impose any financial sanctions, the state is entitled to notice, a reasonable opportunity for correction, and an opportunity for a hearing. 42 U.S.C. § 1397ff(c), (d); 42 C.F.R. §§ 457.203, 457.204. CMS generally does not hold a hearing until it has made a reasonable effort to resolve the issue through conferences and discussions. *Id.* § 457.204(a)(2). If a compliance hearing nonetheless becomes necessary, the state is afforded the full panoply of trial-type procedural protections. *Id.* § 457.206. After the hearing, CMS may withhold payments, in whole or in part, only if the Administrator finds that the state plan is in "substantial noncompliance" with federal requirements. *Id.* § 457.204(a).

10

Any state dissatisfied with "the Administrator's final determination on approvability of plan material (§ 457.203) or compliance with Federal requirements (§ 457.204) has a right to judicial review." *Id.* § 457.208(a); *see also* 42 U.S.C. § 1397gg(e)(2)(B); *id.* § 1316(a), (b). Specifically, the CHIP statute provides that the administrative and judicial review provisions for Medicaid, *i.e.*, Section 1116 of the Social Security Act, also apply to CHIP. *Id.* § 1397gg(e)(2)(B); *see also id.* § 1316(a). To obtain judicial review, "[t]he State must file a petition for review with the U.S. Court of Appeals for the circuit in which the State is located." 42 C.F.R. § 457.208(b)(1); *see also* 42 U.S.C. § 1316(a).

None of these required steps has happened yet. Florida has not submitted any state plan amendment to CMS, nor has the Administrator denied any such plan amendment.[1] The Administrator has not taken any action to initiate proceedings that could result in a finding that Florida's existing plan is in "substantial noncompliance." Any determination that Florida's plan is noncompliant could "be promptly challenged through an administrative procedure, which in turn is reviewable by a court." *New Jersey*, 2008 WL 4936933, at *10. This review provides "an adequate forum for testing" the policy "in a concrete situation." *Id.* (citation omitted); *accord New York*, 2008 WL 5211000, at *12.

---

[1] Florida's potential request for a "section 1115 waiver" does not change the analysis. Florida asserts that it was told that it must apply for a waiver under Section 1115 of the Social Security Act, 42 U.S.C. § 1315(a), to implement the expanded CHIP program contemplated by Florida H.B. 121, Compl. ¶ 79, and suggests that it intends to do so, *id.* ¶ 81. But Florida acknowledges that it must still submit a state plan amendment. *See id.* ¶ 79. Florida has submitted neither a waiver application nor a state plan amendment.

11

Further, the issues presented in this case would benefit from further factual development. For example, Florida makes the speculative claim that it "*anticipates* that compliance with the [CMS] FAQs will cost approximately $1 million each month," Pls.' Mot. at 23 (emphasis added), but provides no specifics about how it arrived at this figure. And while Florida may claim that it challenges only the legality of the FAQs, that is not sufficient to establish the claim is ripe. *See New Jersey*, 2008 WL 4936933, at *11 (claim was unripe despite the fact that the "rulemaking claim [was] predominantly legal").

Delayed review would pose no significant hardship to Florida. "[I]n weighing the hardship to the parties of withholding court consideration," the fact that "there are available administrative remedies which are not even referred to, much less shown to have been exhausted," is "crucial." *Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 28 (2d Cir. 1984). Florida has "not established that [it] face[s] significant hardship" because "no administrative proceedings against the State or withholding of funds for noncompliance have begun." *Tennessee*, 329 F. Supp. 3d at 618; *see also New York*, 2008 WL 5211000, at *14 ("If Plaintiffs choose not to abide by the SHO Letter guidance, it is not clear that they will face any penalties, other than the possible rejection of their []CHIP plan amendment, which can be challenged in federal circuit court.")

Moreover, unlike the formal regulations at issue in *Abbott Laboratories*, which were "effective immediately upon publication," 387 U.S. at 152, the FAQs are not

12

self-executing. They do not on their own "grant, withhold, or modify any formal legal license, power, or authority" or "subject anyone to any civil or criminal liability." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 809 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733). Like the CHIP SHO Letter at issue in *New York* and *New Jersey*, the FAQs do "not create obligations or legal consequences" for Florida—indeed, "[a] state does not face any legal obligation to change its plan until the CMS Administrator initiates non-compliance proceedings." *New York*, 2008 WL 5211000, at *13. The FAQs merely constitute an interpretive rule intended to provide states with guidance on what CMS understands the effect of the CAA's amendments to be. *See Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983). Because CMS has taken no action against Florida—something it could do only by proceeding through the administrative process and making a final determination, a process that has not even begun—Florida's claims are not ripe. *See Flowers Indus. v. FTC*, 849 F.2d 551, 552-53 (11th Cir. 1988) (holding challenge to FTC letter was not ripe because the FTC could only effectuate letter by bringing an enforcement action seeking civil penalties).

**B.    This Court lacks jurisdiction under the CHIP statute.**

This Court also lacks jurisdiction because the CHIP statute assigns judicial review of issues concerning plan compliance to the Courts of Appeals. *See* 42 U.S.C. §§ 1397gg(e)(2)(B), 1316; *see also* 42 C.F.R. § 457.208(a), (b). Where it is "fairly discernible" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside

13

that scheme is precluded. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (citation omitted). In such circumstances, claims may only proceed outside that scheme if they are not "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212. Courts "presum[e] that Congress does not intend to limit . . . jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (citation omitted).

Florida "cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion." *Doe v. Fed. Aviation Admin.*, 432 F.3d 1259, 1263 (11th Cir. 2005); *see also New York,* 2008 WL 5211000, at *15 (holding that review of challenges to federal CHIP plan requirements is limited to the court of appeals); *Tennessee*, 329 F. Supp. 3d at 620 (same for Medicaid, which involves same statutory review provision). Florida's motion seeks to enjoin Defendants from "enforcing the FAQs and prohibiting Florida from disenrolling CHIP participants for nonpayment of premiums." Pls.' Mot. at 25; *see also* Compl., Prayer for Relief (seeking injunction against "enforcing the FAQs" by, *e.g.*, "disapproving a state CHIP plan amendment, denying a CHIP waiver, or initiating a non-compliance finding or corrective action plan based on the FAQs"). But as previously described, CMS could not take any such action before completing a lengthy administrative process that has

14

not even begun. And Congress has created an exclusive remedy for states to challenge any final determination reached after such an administrative process, culminating with review in the Court of Appeals. *See supra* Section I.A. As in *Thunder Basin*, 510 U.S. at 206, allowing Florida to challenge a guidance document prior to any concrete agency action against the state would disrupt this comprehensive statutory review scheme and hamper CMS's effective administration of CHIP. *See Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000).

Each *Thunder Basin* factor weighs in favor of the conclusion that Congress meant to limit jurisdiction over the claims at issue here. First, precluding judicial review now would not foreclose meaningful review later. To the contrary, the comprehensive administrative and judicial review scheme in the CHIP statute is analogous to that of the Mine Act in *Thunder Basin*. *Compare* 42 U.S.C. § 1316 *with Thunder Basin*, 510 U.S. at 208 (citing 30 U.S.C. § 816(a)(1)). Because "the validity of agency policymaking can be reviewed under § 1316," *New York*, 2008 WL 5211000, at *16, Florida may raise the same arguments it does here when it appeals from any denial of a state plan amendment or other determination of noncompliance.

Florida's claims are also not "wholly collateral" to the administrative review scheme but go to the heart of the statute and regulations that CMS enforces. *See Doe*, 432 F.3d at 1263. Florida's claimed harm centers on whether its current or proposed amended state plans are consistent with the interpretation set forth in the FAQs. *See, e.g.*, Pls.' Mot. at 24 ("[I]f Florida continues disenrollments in violation of the FAQs,

15

it faces withholding of the federal funds it receives for CHIP."). This is precisely the type of plan-conformity dispute that Congress specified should be reviewed only by the Courts of Appeals. *See New York*, 2008 WL 5211000, at *16; *see also New Jersey v. HHS*, 670 F.2d 1262, 1272-77 (3d Cir. 1981) (explaining that when a dispute concerns whether a Medicaid plan conforms to federal requirements, "initial appellate-level review" is appropriate); *Tennessee*, 329 F. Supp. 3d at 620 (rejecting the plaintiffs' argument that Section 1316 did not apply to whether federal "Medicaid requirements comply with the United States Constitution"). And finally, the State's claims, which concern the proper interpretation of the Medicaid and CHIP statutes, fall squarely within the agency's expertise, particularly given the well-recognized complexities of the regulatory scheme. *See Elgin*, 567 U.S. at 23 (considering in expertise analysis that "the challenged statute may be one that [the agency] regularly construes"); *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Ci. 2007) (the "Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration"). In sum, Section 1316(a) precludes this Court's review of Florida's challenge here.

## II.   Florida does not face irreparable harm.

Even if this Court had jurisdiction, Florida's request for a preliminary injunction should be denied. "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163,

1176 (11th Cir. 2000). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted); *see also Winter*, 555 U.S. at 22. Florida has made no such showing here.

*First*, Florida has not shown that any actual or imminent loss of funding will occur absent a preliminary injunction. As detailed above, an extensive administrative process must take place before CMS could take any action to withhold federal funding from Florida's CHIP, *see supra* Section I.A, and none of the requisite steps have been taken here. The Administrator has not initiated any process to find Florida's plan is in substantial noncompliance. And regardless of whatever changes have been made to Florida state law, Florida has not submitted any plan amendment or waiver request to CMS regarding its purported CHIP expansion. "A district court should not issue a preliminary injunction unless it concludes that the movant will suffer immediate harm if relief is delayed until the case is finally resolved on the merits." *De La Fuente v. Kemp*, 679 F. App'x 932, 934 (11th Cir. 2017). Even if Florida could conceivably suffer irreparable harm at some point in the future, it has offered no reason to believe that harm "will occur before the district court can rule on [its] requests for a permanent injunction and declaratory relief." *Id.*

*Second*, Florida offers no explanation why it waited so long to seek a preliminary injunction, severely undermining its claim that irreparable injury is imminent. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v.*

17

*Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Here, Florida waited more than three months after the FAQs were issued in October 2023 to seek emergency relief. That the State "pursued its preliminary-injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time" severely undermines any argument that the State will be imminently harmed in the absence of preliminary relief. *Id.* at 1246; *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay undercut the claim of irreparable harm); *St. Marie v. Ludeman*, 2010 WL 924420, at *4 (D. Minn. Mar. 11, 2010) (three-week delay "undermines [plaintiff's] claims of imminent irreparable harm").

*Third*, Florida's alleged "sovereign injury" does not support a claim of irreparable harm. It asserts that Fla. Stat. § 624.91(5)(b)(9) "requires disenrolling CHIP participants for nonpayment of premiums," so it is "caught between CMS and Florida law." Pls.' Mot. at 21-22. However, the statutory provision Florida cites does not say this. Instead, it merely provides that Florida's CHIP plan shall "[e]stablish enrollment criteria that include penalties or waiting periods of 30 days for reinstatement of coverage upon voluntary cancellation for nonpayment of family premiums." Fla. Stat. § 624.91(5)(b)(9). The statute says nothing about continuous eligibility, let alone that Florida law requires disenrollment for nonpayment of premiums. In any event, mere preemption of state law does not amount to irreparable harm. "[I]t is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida*

18

*v. HHS,* 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). As the Eleventh Circuit has explained, "to conclude otherwise would mean that a state would suffer irreparable injury from all . . . federal laws with preemptive effect." *Id.* at 1292.

*Fourth*, Florida claims that it will incur monetary harm because it "anticipates that compliance with the FAQs will cost approximately $1 million each month." Pls.' Mot. at 23. As noted, any "anticipated" monetary loss is speculative at this juncture. *See Clapper v. Amnesty International USA*, 568 U.S. 398, 418 (2013). And other courts have flatly rejected claims that a state confronts an "untenable dilemma" when deciding whether to "conform its plan, at great expense, to the requirements of" CMS policy or instead to risk the "possibility of corrective action and the loss of its []CHIP funding." *New Jersey*, 2008 WL 4936933, at *9. Were the law otherwise, a state could claim irreparable harm virtually any time it disagreed with CMS's view of the regulatory scheme. Accordingly, Florida has not shown imminent irreparable harm.

## III.   Florida is unlikely to succeed on the merits.

Florida is also unlikely to succeed on the merits of any of its claims, as the FAQs both correctly interpret the statute and are procedurally sound.

### A.   The FAQs properly interpret the CAA's amendments to CHIP.

In the CAA, Congress for the first time directed that continuing eligibility in CHIP "shall" be applied "in the same manner" as in Medicaid, where states are not permitted to terminate coverage for nonpayment of premiums during periods of

continuing eligibility. This meant that the prior, CHIP-only regulatory exception could not survive, an understanding that CMS correctly explained in the FAQs.

This conclusion follows from the statute's plain text. Under prior law, the Medicaid statute provided that states "may" offer continuing eligibility for a period of up to 12 months, during which time a child "determined to be eligible for benefits under a State plan . . . shall remain eligible for those benefits." 42 U.S.C. § 1396a(e)(12) (2022). CMS subsequently promulgated two regulations that are relevant here.

Under the first regulation, which concerned Medicaid, a "child's eligibility may not be terminated during a continuous eligibility period" unless one of five exceptions is met. 42 C.F.R. § 435.926(d). Consistent with preexisting Medicaid regulations, which provided that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible," *id.* § 435.930(b), the continuous eligibility regulation for Medicaid contained no exception permitting termination for nonpayment of premiums during a continuous eligibility period.

The second regulation, which concerned CHIP, contained an additional exception unique to that program. It provided that, "[i]n addition to the" exceptions in 42 C.F.R. § 435.926(d) permitting termination of Medicaid eligibility, in CHIP "a child may be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees under the State plan." *Id.* § 457.342(b). This exception did not apply to Medicaid.

In the CAA, Congress fundamentally altered this scheme. In addition to making

20

continuing eligibility mandatory, rather than optional, for both Medicaid and CHIP, it provided that the requirement "shall" be applied "in the same manner" in both programs. Specifically, in a section of the CAA titled "Continuous Eligibility for Children Under Medicaid and CHIP," Congress amended the Medicaid statute to require that a "State plan . . . shall provide" that children "determined to be eligible for benefits under a State plan" generally "shall remain eligible for such benefits" for a 12-month period. CAA § 5112(a) (amending 42 U.S.C. § 1396a(e)(12)). And in the same section of the CAA, Congress amended the CHIP statute to incorporate this Medicaid requirement by reference. *Id*. § 5112(b) (amending 42 U.S.C. § 1397gg(e)(1)). As a result, the CHIP statute now provides that, with one exception, the continuing eligibility requirement in Section 1902(e)(12) of the Medicaid statute, as amended by the CAA, "shall apply to States under this subchapter [i.e., CHIP] in the same manner as they apply to a State under subchapter XIX [i.e., Medicaid]." 42 U.S.C. § 1397gg(e)(1)(K).

Given these changes to the statutory framework, CMS rightly understood that the prior CHIP-specific regulatory exception permitting termination of coverage for nonpayment of premiums during periods of continuing eligibility could not survive. Indeed, the sole exception that Congress provided to its "in the same manner" directive—that CHIP coverage may end if the child "becomes eligible for full benefits under" and is "transferred to" the state's Medicaid program for the remainder of the continuing eligibility period, CAA § 5112(b)—confirms this conclusion. *See United*

21

*States v. Castro*, 837 F.2d 441, 442 (11th Cir. 1988) ("A general guide to statutory construction states that the mention of one thing implies the exclusion of another." (citation omitted)).

Florida's arguments to the contrary cannot overcome the statute's plain text. The State principally contends that the FAQs improperly equate the words "eligibility" and "enrolled." Pls.' Mot. at 14-15. But that ignores the statutory and regulatory scheme that Congress was legislating against. In Medicaid, it has long been the case that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible," 42 C.F.R. § 435.930(b); accordingly, in that program, there has never been an exception to continuing eligibility for termination for nonpayment of premiums, *see id.* § 435.926(d). "Congress can be presumed to be aware of relevant administrative interpretations when reenacting or amending a statute[.]" *Duarte v. Mayorkas*, 27 F.4th 1044, 1059 (5th Cir. 2022). Thus, when requiring in the CAA that continuing eligibility be applied "in the same manner" in the two programs, Congress necessarily understood that CHIP beneficiaries would now receive uninterrupted coverage during the continuous eligibility period, as Medicaid beneficiaries already did. *See also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (courts must look to "the language and design of the statute as a whole").[2]

---

[2] Florida relies on text of a draft bill that states that "an individual who is determined to be eligible for [such] benefits . . . shall remain eligible *and enrolled* for such benefits for the duration of the specified period." Pls.' Mot. at 15 (citation omitted). However, a draft bill text that never advanced out of committee, let alone became law, is of minimal probative value. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021), Congress.gov,

Indeed, Florida's interpretation would effectively render the continuous eligibility requirement in Medicaid superfluous. In the State's telling, the phrase "shall remain eligible for such benefits," CAA § 5112(a), does no more than prohibit states from conducting an eligibility redetermination during the 12-month continuous eligibility period. But existing Medicaid regulations prohibit states from requiring a renewal of eligibility more frequently than every 12 months. 42 C.F.R. § 435.916(a). For the phrase "shall remain eligible for such benefits" to have the practical effect of stabilizing coverage for low-income children, it must mean that states are required to maintain coverage during the continuous eligibility period, absent an exception. *See TRW Inc. v. Andrews*, 534 U.S. 19, 29, 31 (2001) (refusing to adopt interpretation that "would in practical effect render that exception entirely superfluous in all but the most unusual circumstances"); *see also Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir. 1993). Accordingly, when read in the context of the broader Medicaid statute and its regulations, the phrase "shall remain eligible for such benefits" in CAA § 5112(a) means that states cannot terminate coverage, not that they must merely consider beneficiaries to meet the eligibility criteria. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021) ("The most grammatical reading of a sentence in a vacuum does not always produce the best reading in context.").

Florida's contention that the FAQs conflict with 42 U.S.C. § 1397cc(e)(3) also

---

https://www.congress.gov/bill/117th-congress/senate-bill/646/all-actions?overview=closed&s=5&r=20&q=%7B%22search%22%3A%22S.+646%22%7D#tabs   (last accessed Feb. 19, 2024).

fails. As the title of that provision indicates, it addresses "Premium grace period[s]," not the distinct issue of whether CHIP coverage may be terminated during a continuing eligibility period. Specifically, Section 1397cc(e)(3) provides that a state must give CHIP beneficiaries "a grace period of at least 30 days from the beginning of a new coverage period to make premium payments" before coverage may be terminated, *id*. § 1397cc(e)(3)(C)(i), with "new coverage period" defined as "the month immediately following the last month for which the premium has been paid," *id*. § 1397cc(e)(3)(C)(ii)(II). Contrary to Florida's suggestion, this provision can be read in harmony with the CAA's amendments: If a beneficiary fails to make premium payments at some point within the continuous eligibility period, the grace period would still begin the following month and last for "at least 30 days," until the end of the continuous eligibility period. *See id*. § 1397cc(e)(3)(C)(i). And the state would still be required to provide notice "not later than 7 days" from the start of the grace period that failure to make a missed premium payment "within the grace period"—*i.e.*, by the end of the continuous eligibility period—"will result in termination of coverage." *Id*. § 1397cc(e)(3)(C)(ii)(I). "It is this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018), and it can readily do so here.

Finally, the FAQs do not violate the grandfathering provisions of the CHIP statute. It is true that Florida's program was grandfathered into CHIP when it was created in 1997, *see id*. § 1397cc(d)(1)(C), but that does not give Florida *carte blanche* to

24

refuse to update its CHIP plan to comply with federal law. The provision cited by Florida concerns the package of benefits that a CHIP plan must offer, not eligibility for coverage. Specifically, Section 1397cc, which is titled "Coverage requirements for children's health insurance," begins by defining the "[r]equired scope of health insurance coverage," *id.* § 1397cc(a), such as the "basic services" it must include and their "actuarial value," *id.* § 1397cc(a)(2)(A)-(B). The statute then grandfathers in "existing" plans, including Florida's, considered to have sufficiently "comprehensive . . . coverage," *id.* § 1397cc(d), and permits states to make "modifications" to such plans that "do[] not reduce the actuarial value of the coverage," *id.* § 1397cc(d)(2). These scope-of-benefits issues are fundamentally different from the eligibility issues addressed by the FAQs. Section 1397cc(a)(3) thus has no relevance here.

### B.   CMS's interpretation of the CAA is not arbitrary and capricious.

Florida claims the FAQs are arbitrary and capricious for three reasons. *See* Pls.' Mot. at 17-19. It is wrong at each turn.

*First*, it was hardly "illogical" for CMS to reason that the regulatory exceptions to continuous eligibility common to Medicaid and CHIP survived the CAA's amendments, but the exception unique to CHIP could not. As explained, *see supra* Section III.A., the CHIP statute now states that the Medicaid statute's continuous eligibility requirement applies to CHIP "in the same manner" as it applies to Medicaid, necessarily signaling the end of the CHIP-only exception. *See* CAA § 5112(b); 42 U.S.C. § 1397gg(e)(1)(K). By contrast, nothing in the CAA casts doubt on the

regulatory exceptions common to Medicaid and CHIP that remain. Indeed, it is common sense that a state would not preserve the eligibility of someone who either (1) has requested termination; (2) has been granted eligibility through error, fraud, abuse, or perjury; or (3) is deceased, 42 C.F.R. § 435.926(d)—measures "important to protecting program integrity," as the agency explained. FAQs at 1. This readily meets the "minimum standards of rationality" required on arbitrary and capricious review. *La. Env't Action Network v. U.S. EPA*, 382 F.3d 575, 582 (5th Cir. 2004); *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (a court must "uphold a decision" of even "less than ideal clarity" so long as "the agency's path may reasonably be discerned").

*Second*, contrary to Florida's claims, CMS did not "reverse[]" its position on any "distinction between eligibility and enrollment," Pls.' Mot. at 18. As explained, in Medicaid, termination of coverage for nonpayment of premiums during periods of continuous eligibility has long been prohibited, and in the CAA, Congress extended this policy to CHIP. *See supra* Section III.A. Thus, as CMS explained in the FAQs, the "existing regulatory option" for states "to consider non-payment of premiums as an exception" to continuous eligibility "will end." FAQs at 1. The FAQs therefore do not amount to a policy change by CMS—they merely communicate that the CAA does not permit the former regulation for the nonpayment of premiums exception to remain in effect. *See infra* Section III.C. Florida's complaint that CMS failed to consider its reliance interests is misdirected, *see* Pls.' Mot. at 19, since it is Congress and not CMS

that chose to change course.

*Third*, Florida's argument that CMS failed to consider that Florida's program was grandfathered into CHIP lacks merit. As described, *supra* at 24-25, these provisions only apply to the list of benefits covered by the state plans. *See* 42 U.S.C. § 1397cc(a)(3), (d). This is wholly irrelevant to whether Florida's CHIP program must comply with federal law and the CAA's requirements for continuous eligibility.

### C.   The FAQs constitute an interpretive rule exempted from the APA's rulemaking requirements.

The APA's rulemaking requirements do not apply to "interpretative rules." 5 U.S.C. § 553(b)(A). "A statement [by an agency] seeking to interpret a statutory or regulatory term is . . . the quintessential example of an interpretive rule." *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993). The FAQs constitute an interpretive rule that sets forth CMS's interpretation of the CAA, so notice and comment was not required.

Courts look to several general principles when determining whether a rule is interpretive. "First, although not dispositive, the agency's characterization of the rule is relevant to the determination. . . .  Second, [a]n interpretative rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties. On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (citation omitted).

The FAQs merely set out CMS's understanding of the CAA's effect on the

27

Medicaid and CHIP, and do not establish a legislative rule. Notably, the agency itself described them only as "guidance." SHO Letter at 1 (CMS "is issuing this [SHO] letter to provide states with guidance" on the CAA); *id.* at 4 n.14 (indicating CMS's intent to "issue separate guidance" on how "nonpayment of premiums intersects with CE under the CAA"). At no point do the FAQs purport to have the force of law. Nor do they purport to exercise delegated power to enact policy. *See Metropolitan Sch. Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992). Instead, CMS's interpretation is drawn directly from the statutory provisions cited. *See Warshauer*, 577 F.3d at 1337-38. Like a "prototypical example of an interpretive rule," CMS issued them "to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quotations omitted).

Further, as explained, *supra* at 12-13, any binding effect the FAQs have flows from the CAA, not the FAQs. An interpretive rule can be binding when the effect is "not by virtue of the promulgation of the regulation (as in the case of a legislative regulation), but by virtue of the binding nature of the interpreted statute." *Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 681 (6th Cir. 2005). Because the FAQs do not create any rights or obligations independent of the statutory provisions they interpret, they constitute an interpretive rule.

IV.     **The equities and the public interest weigh against injunctive relief.**

Finally, Florida has not shown that the balance of equities and the public interest support a preliminary injunction. A "court sitting in equity cannot ignore the

judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (citation omitted). Indeed, where the elected branches have enacted a statute based on their understanding of what the public interest requires, this Court's "consideration of the public interest is constrained . . . for the responsible public officials . . . have already considered that interest." *Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008). Here, Congress has acted to expand continuous eligibility in the CHIP program, and an injunction would risk restricting medical coverage for one of the country's neediest populations: low-income children. "In addition to improving short- and long-term health status, [continuous eligibility] has been shown to reduce financial barriers to care for low-income families, promote health equity, and provide states with better tools to hold health plans accountable for quality care and improved health outcomes." SHO Letter at 2. The public interest would not be served by entering an injunction here, particularly in the absence of any administrative proceedings threatening any concrete harm to Florida.

## CONCLUSION

For the foregoing reasons, Florida's motion for a preliminary injunction should be denied.

DATED: February 20, 2024                    Respectfully submitted,

*Of Counsel*:                               BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney
SAMUEL R. BAGENSTOS                         General
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

JANICE L. HOFFMAN
Associate General Counsel

SUSAN MAXSON LYONS
Deputy Associate General
Counsel for Litigation

LINDSAY S. GOLDBERG
Attorney
U.S. Dept. of Health & Human Services
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 619-2795
Lindsay.Goldberg@hhs.gov

ERIC B. BECKENHAUER
Assistant Director

*/s/ Madeline McMahon*
MADELINE M. MCMAHON (DC
Bar No. 1720813)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, D.C. 20005
(202) 451-7722
madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*