IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:24-cv-317-WFJ-AAS

STATE OF FLORIDA; and FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION,

*Plaintiffs,*

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official capacity as
Administrator for the Centers for Medicare and
Medicaid Services*; DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
XAVIER BECERRA, *in his official capacity as
Secretary of Health and Human Services*,

*Defendants.*

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
PRELIMINARY INJUNCTION**

---

**INTRODUCTION**

Plaintiffs are entitled to a preliminary injunction. PI.Mot.11–25. CMS does not dispute that its October 27, 2023, Frequently Asked Questions ("FAQs") about the Children's Health Insurance Program ("CHIP") under Title XXI of the Social Security Act are final agency action. Nor does CMS dispute that Florida has standing.

Instead, CMS tries to persuade this Court that straightforward questions of law under the Administrative Procedure Act ("APA") about that admittedly-final agency action are somehow unripe, Opp.8–13, and that this Court lacks jurisdiction because CMS could potentially reach some of the same issues in *future* agency proceedings, Opp.13–16. Neither argument is persuasive. The FAQs are clear that States cannot "terminate CHIP coverage during a continuous eligibility ... period due to non-payment of premiums," and even purport to "end" an existing regulatory provision at 42 C.F.R. § 457.342(b) that provides otherwise. Ex.4, FAQs at 1. Future agency proceedings are also not guaranteed, anyway.

If CMS had taken the necessary steps to amend or rescind its regulations, Florida would unquestionably be able to sue *now* under the APA. But instead, CMS has tried to change its regulations by fiat and now cites that unlawful procedure to justify circumventing judicial review. This Court should reject that charade.

CMS also has no answer on the merits for why it abandoned the well-established distinction between "eligibility" and "enrollment," pervasive throughout Title XXI and CHIP regulations, and instead implausibly suggests that Congress subtly transformed CHIP into an entitlement program in an omnibus appropriations

bill—without even amending the statutory provision that expressly states CHIP is *not* an entitlement program. Opp.19–24. Nor can CMS negate Florida's sovereign injury and ongoing, unrecoverable costs to comply with the FAQs. *See* Opp.16–18.

This Court should grant the preliminary injunction.

## I.   This Case is Justiciable

### A.   Florida's Claims Are Ripe

"In cases involving pre-enforcement review, like this one, the standing and ripeness analysis tend to converge." *Baughcum v. Jackson*, 92 F.4th 1024, 1036 (11th Cir. 2024). CMS has not challenged Florida's standing, and, in any event, where "the plaintiff is himself an object of the action (or forgone action) at issue … , there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). That is the end of the matter here: the claims are ripe.

A systematic march through the ripeness doctrine reinforces that conclusion. The inquiry "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). Courts must "assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Every consideration weighs in favor of adjudicating this case.

*First*, Florida raises purely legal issues, making them quintessential questions

2

"fit for judicial decision." *Club Madonna, Inc. v. City of Mia. Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). "A facial challenge presenting a purely legal argument … 'is presumptively ripe for judicial review' because that type of argument does not rely on a developed factual record." *Id.*; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). CMS defends the FAQs based "purely [on] congressional intent," and has "made no effort to justify the [FAQs] in factual terms" or identify any pertinent issue that would benefit from factual development. *Abbott Lab'ys*, 387 U.S. at 149; *see* Opp.19–28.[1] Nor is factual development necessary to determine whether CMS followed the procedures required by the APA. These claims are all within the core competency of this Court, not future CMS proceedings. *See infra* Part I.B. In other words, "[t]he lines are drawn, the positions taken, and the matter is ripe for judicial review." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

*Second*, because the claims here are "fit for judicial decision," "the absence of a 'hardship' cannot tip the balance against judicial review." *Club Madonna*, 924 F.3d at 1380 (cleaned up). But to be clear, withholding review *will* cause Florida "substantial hardship," which also satisfies the ripeness inquiry. *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995). The FAQs "set a collision course with Florida law," *Weinberger*, 492 F.2d at 492, and Florida is "forced to choose between foregoing lawful activity and risking substantial legal sanctions," *Cheffer*, 55 F.3d at 1524. If Florida complies with

---

[1] CMS's sole example—Florida's estimate of compliance costs, Opp.12—is irrelevant to ripeness. Those costs demonstrate Florida's imminent injury to justify a preliminary injunction, *see infra* Part III, but have no bearing on whether the FAQs are lawful or otherwise comply with the APA.

the FAQs, it will incur approximately $1 million in unlawful CHIP expenditures each month. Ex.1, Noll.Decl. ¶ 10. If Florida ignores the FAQs, it faces the loss of millions of dollars in federal CHIP reimbursements. This case aligns perfectly with binding precedent rejecting a ripeness challenge in *Weinberger*, 492 F.2d at 492:

> [The FAQs are] final and ... actually in effect.... [Florida] is presently faced with the dilemma whether to bow to [CMS's] volte-face and amend its laws and procedures, with all the likely financial outlay and certain legislative and administrative effort which that process entails, or to risk the at least temporary loss of funding which [noncompliance] could well produce.... In the process of [issuing the FAQs], [CMS] has already necessarily determined that [they] compl[y] with the [Consolidated Appropriations Act, 2023 ("2023 CAA")], and if [they] d[o], plainly Florida law does not.... The calamitous prospect of such a loss of funding, even for a short period, to the state ... is so grave as to suffice for such hardship as may be required. Faced with the serious risk of such sanctions, there is no need for Florida to stand by while [CMS] ticks, hoping that [it] will not go off.

CMS is wrong to suggest the FAQs are not "self-executing." Opp.12–13. They purport to "end" 42 C.F.R. § 457.342(b) and prohibit States from "consider[ing] non-payment of premiums" as grounds for CHIP disenrollment after December 31, 2023. Ex.4, FAQs at 1. Like the regulations the Supreme Court found ripe for review in *Gardner v. Toilet Goods Ass'n*, the FAQs "have an immediate and substantial impact" by placing Florida "in a quandary." 387 U.S. 167, 171–72 (1967). Florida is not required to "refuse to comply ... and test the [FAQs] by defending against" civil suits or CMS enforcement, or to "submit to the [FAQs]" and the financial and sovereign injuries they impose, just to obtain judicial review. *Id.*

CMS relies heavily on two unpublished, out-of-circuit district court opinions—*New Jersey v. HHS*, 2008 WL 4936933 (D.N.J. Nov. 17, 2008), and *New York v. HHS*,

4

2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008)—which are foreclosed by the binding precedent discussed above, and in any event are easily distinguishable. Opp.8, 11–13. Both involved challenges to a State Health Official ("SHO") Letter about procedures to ensure state CHIPs did not "crowd out" private insurance. *New Jersey*, 2008 WL 4936933, at *5; *New York*, 2008 WL 5211000, at *5. Both held that this SHO Letter was not "final agency action," and that CMS had already shown "flexibility" in considering and approving state CHIPs with "alternative approaches." *New Jersey*, 2008 WL 4936933, at *6, 12–13; *New York*, 2008 WL 5211000, at *11–13. And both concluded that factual development was needed to see how the SHO Letter would apply and whether its provisions were "impossible or unduly burdensome." *New Jersey*, 2008 WL 4936933, at *11; *New York*, 2008 WL 5211000, at *12–13.

None of those characteristics are present here. CMS does not dispute that the FAQs are final agency action, nor would the claims here benefit from factual development. The FAQs are clear that States cannot "terminate CHIP coverage during a continuous eligibility ... period due to non-payment of premiums," and purport to "end"—*with no further action needed*—an existing regulatory provision that provides otherwise. Ex.4, FAQs at 1. CMS has not disclaimed this position or its intent to enforce the FAQs, but now implausibly feigns ignorance about how they will apply.

CMS also ignores cases that challenge agency statements unequivocally articulating positions and that raise purely legal claims that would not benefit from factual development. Courts have had no trouble concluding those claims are ripe, including challenges to CMS "guidance." *See Texas v. Brooks-LaSure*, 2023 WL

4304749, at *7 (E.D. Tex. June 30, 2023) ("purely legal" substantive and procedural APA challenges to CMS "informational bulletin" are ripe).[2]

For all these reasons, the claims here are undoubtedly ripe.

### B.    This Court Has Jurisdiction Under the APA

Judicial review of agency action is presumptively available under the APA. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). CMS responds that this Court's jurisdiction is impliedly precluded because the Social Security Act provides for CMS review of a "determination" related to a particular state plan or plan amendment, followed by review in the U.S. Courts of Appeals. Opp.13–16 (citing 42 U.S.C. §§ 1316, 1397gg(e)(2)(B)). Implied preemption by a "special statutory review scheme," however, "does not necessarily extend to every claim concerning agency action," but only to those "'of the type Congress intended to be reviewed within [the] statutory structure.'" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185–86 (2023). Florida is not challenging any plan-related "determination." There's zero indication Congress intended administrative review under the Social Security Act to foreclose purely legal APA claims in district court.

Courts considering implied preclusion have also looked to three factors articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), all of which favor

---

[2] *See also, e.g.*, *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 52–53 (D.D.C. 2020) (HHS guidance); *Texas v. HHS*, 2023 WL 4629168, at *11 (W.D. Tex. July 12, 2023) (HHS guidance); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380–81 (D.C. Cir. 2002) (EPA guidance); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1026–30 (N.D. Cal. 2020) (IRS FAQs); *Alabama v. CMS*, 2010 WL 1268090, at *4–5 (M.D. Ala. Mar. 30, 2010) (procedural APA challenges to CMS SHO letter); *Seafood Exps. Ass'n of India v. United States*, 479 F. Supp. 2d 1367, 1376–81 (Ct. Int'l Trade 2007) (customs directive).

6

jurisdiction here.[3] *First*, "preclusion could foreclose all meaningful judicial review." *Id.* at 212–13. Even the mere possibility that judicial review would be unavailable is enough to rule out implied preclusion. *Cochran v. SEC*, 20 F.4th 194, 209–10 (5th Cir. 2021), *aff'd sub nom. Axon*, 598 U.S. 175. If Florida complies with the FAQs, it won't receive a CMS "determination" reviewable under the Social Security Act, leaving Florida "'unable to seek redress.'" *Brooks-Lasure*, 2023 WL 4304749, at *9. Florida's only option would be to "bet the farm" and ignore the FAQs "before testing [their] validity," which is not "a 'meaningful' avenue of relief." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490–91 (2010) (cleaned up); *see Weinberger*, 492 F.2d at 492.

*Second*, Florida's claims are "wholly collateral" to the Social Security Act review scheme. *Thunder Basin*, 510 U.S. at 212 (cleaned up). Again, Florida is not challenging a "determination" about its CHIP plan, *contra* Opp.15–16, but instead whether the FAQs are lawful. That is standard fare for APA review.

*Third*, Florida's claims are "outside [CMS's] expertise." *Thunder Basin*, 510 U.S. at 212. CMS has no advantage in applying general rules of statutory interpretation or adjudicating the requirements of the APA. Those "are instead standard questions of administrative law, which the courts are at no disadvantage in answering." *Free Enter. Fund*, 561 U.S. at 491.

Finally, this Court should consider the remarkable reach of CMS's argument

---

[3] All factors need not favor Florida to conclude the district court has jurisdiction. *Axon*, 598 U.S. at 186. Even if a party can "(eventually) obtain review of ... claims through an appeal from an adverse agency action to a court of appeals," *id.* at 190–91, district court jurisdiction may still be warranted.

that the existence of *any* administrative review scheme effectively "divests district courts of their ordinary jurisdiction over" *all* APA claims. *Axon*, 598 U.S. at 185–86. That was not Congress's intent. *Id.* at 186.

If CMS had taken *any* steps to properly amend its regulations, i.e., by publication in the Federal Register, 5 U.S.C. § 552(a)(1), Florida undoubtedly could challenge that agency action in district court. CMS instead violated the APA to "end" a regulation by fiat and now cites that unlawful procedure to justify circumventing the judicial review that would otherwise be available. The D.C. Circuit anticipated this very maneuver when it held that notice and comment is required, and judicial review is available, whenever an agency even "effectively amends a prior legislative rule." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995). This Court should do the same.

## II.     Florida Is Likely to Prevail on the Merits

### A.     The FAQs Are Contrary to Law and Exceed CMS's Authority

The FAQs violate Title XXI's express provision for the disenrollment of CHIP participants for nonpayment of premiums, 42 U.S.C. § 1397cc(e)(3)(C), Title XXI's grandfathering provisions, *id.* § 1397cc(a)(3), (d), and CHIP regulations, 42 C.F.R. § 457.342(b). They also exceed the plain language of the 2023 CAA. PI.Mot.12–17.

CMS has no persuasive response. It ignores that Title XXI and CHIP regulations have for decades carefully distinguished between "eligibility" for CHIP

benefits and "enrollment" in a CHIP plan. PI.Mot.14–15 & nn.8–9.[4] Instead, CMS myopically focuses on its own Medicaid regulations that require States to "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930(b). No such requirement exists for CHIP, and for good reason. Congress expressly provided that CHIP, unlike Medicaid, is *not* an entitlement program. 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan."). "Eligibility" thus has different consequences for the two programs: individuals eligible for Medicaid are entitled to state-provided health insurance coverage, 42 C.F.R. § 435.930(b), while individuals eligible for CHIP have the opportunity to enroll in a state-subsidized health plan, *see, e.g.*, *id.* § 457.340(d)(3).

Section 5112(a) of the 2023 CAA didn't change that difference. It requires only that States refrain from redetermining a child's eligibility for Medicaid—for example, based on a change in family income—for an entire year. 42 U.S.C. § 1396a(e)(12). Applying that provision to CHIP "in the same manner" means only that States cannot redetermine a child's eligibility for CHIP for an entire year, either. *Id.* § 1397gg(e)(1).

CMS would instead "fundamentally alte[r]" CHIP, transforming it into an entitlement program. Opp.20. Not only does that violate the clear statement in 42 U.S.C. § 1397bb(b)(5) that CHIP is *not* an entitlement program, it contravenes the familiar canon that Congress doesn't "hide elephants in mouseholes," *Whitman v. Am.*

---

[4] The difference is not a foreign concept or unique to CHIP. For example, every attorney knows that eligibility for fee shifting does not necessarily mean entitlement or receipt.

*Trucking Ass'ns*, 531 U.S. 457, 468 (2001), or, in this case, a passing revision buried in a 1,653-page omnibus *appropriations* bill, *see* 2023 CAA § 5112, 136 Stat. at 5940.

CMS continues that surely Congress was aware of CMS regulations guaranteeing Medicaid benefits during periods of continuous eligibility, and thus intended to extend that to CHIP. Opp.22. That is precisely the wrong inference. Congress was surely aware of the longstanding distinction between "eligibility" and "enrollment," *see* PI.Mot.14–15 & nn.8–9, and that Title XXI and CMS regulations allow CHIP participants to be disenrolled for nonpayment of premiums, PI.Mot.13. Congress nonetheless chose to legislate continuous *eligibility*, not continuous *enrollment*, *coverage*, or *benefits*. In fact, different bills would have legislated continuous enrollment, which never became law. PI.Mot.15. This proves Congress was not only aware of the distinction but also rejected the plan that CMS now tries to accomplish.

CMS is also wrong that a straightforward reading of the 2023 CAA would render it "superfluous" because a Medicaid regulation already "prohibit[s] states from requiring a renewal of eligibility more frequently than every 12 months." Opp.23 (citing 42 C.F.R. § 435.916(a)). Replacing a *regulatory* Medicaid requirement with a *statutory* one is not a superfluous endeavor, especially when simultaneously enacting new statutory requirements for CHIP. *United States v. Miles*, 75 F.4th 1213, 1223 (11th Cir. 2023). CMS has a habit of conflating its own regulations with actual statutes.

In any event, the 2023 CAA doesn't restate 42 C.F.R. § 435.916, which actually requires States to "promptly redetermine eligibility between regular renewals of eligibility ... whenever it receives information about a change in a [participant's]

10

circumstances that may affect eligibility." *Id.* § 435.916(a)(1), (d)(1). Medicaid continuous eligibility was previously *optional*. *See* 42 U.S.C. § 1396a(e)(12) (2022); 42 C.F.R. § 435.926; Opp.4. The 2023 CAA now generally prohibits States from redetermining eligibility during a *mandatory* continuous eligibility period.

CMS's attempt to "harmonize" the FAQs with 42 U.S.C. § 1397cc(e)(3) also falls flat. Opp.24. CMS reasons that States must still notify CHIP participants that failure to pay premiums "will result in termination of coverage," and that the "grace period" is whatever remains of the continuous eligibility period. *Id.* But CMS abruptly stops its analysis there and never explains when a State actually *can* terminate coverage (i.e., disenroll) or lock out participants for nonpayment of premiums. Nor does CMS even attempt to reconcile this argument with its simultaneous assertions that continuous eligibility in CHIP must have the same effect as in Medicaid, which allows for no such notices, disenrollment, or lock-out periods. *See* 42 C.F.R. § 435.930(b).

That isn't the only place where CMS's argument collapses under its own weight. If applying continuous eligibility "in the same manner" has the same effect on receiving benefits, then CHIP benefits could not be conditioned on paying enrollment fees or the first month's premium, which the FAQs allow. Ex.4, FAQs at 1. Nor could CHIP require copayments, 42 U.S.C. § 1397cc(e)(1), which CMS leaves untouched.

Finally, CMS is wrong that the Title XXI grandfathering provisions apply only to "the package of benefits" a plan offers, and so are irrelevant to "eligibility issues" in the FAQs. Opp.25. Those statutory provisions give broad authority to qualifying States like Florida to retain and modify grandfathered plans that maintain minimum

coverage requirements. 42 U.S.C. § 1397cc(a)(3), (d). The statutory text doesn't limit that authority to "benefits." Nor are the FAQs concerned only with "eligibility issues," as they require States to extend *benefits* to non-paying participants. CMS also ignores that Florida has been providing continuous eligibility, contingent on payment of premiums, since long before Congress enacted CHIP, and continued to do so as a grandfathered plan before CMS allowed for that possibility by regulation in 2016. PI.Mot.6. The 2023 CAA did nothing to change 42 U.S.C. § 1397cc(a)(3), (d).

## B.    The FAQs are Arbitrary and Capricious

The FAQs are not "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). They are illogical, reverse the well-established distinction between CHIP eligibility and enrollment, and fail to consider reliance interests or grandfathering provisions. PI.Mot.17–19; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

CMS's response only further reveals the inconsistency of its position. CMS maintains that "nothing in the CAA casts doubt on the regulatory exceptions" to continuous eligibility that it chose to retain, Opp.25–26, but nothing in the 2023 CAA authorizes those exceptions, either. By using the term "eligibility" rather than "enrollment" and leaving untouched 42 U.S.C. § 1397bb(b)(5)—which provides that CHIP is not an entitlement program—the 2023 CAA actually provides more support for allowing disenrollment for premium nonpayment than for keeping CMS's preferred exceptions. Despite CMS's claims otherwise, Opp.26, the FAQs abandon CMS's longstanding recognition of that distinction, PI.Mot.15 & n.9.

12

CMS also acted arbitrarily by ignoring grandfathering provisions and the reliance interests of States. PI.Mot.19. CMS claims those considerations were unnecessary because Congress imposed the ongoing provision of benefits, Opp.26–27, but Congress didn't do that, *see supra* Part II.A, and CMS cannot assert flexibility to retain its preferred regulatory exceptions while inconsistently claiming to be handcuffed when it comes to other considerations or exceptions.

### C.   The FAQs Violate the APA's Procedural Requirements

The FAQs are a legislative rule subject to the APA's notice-and-comment requirements. *See* PI.Mot.20–21. CMS mischaracterizes the FAQs by claiming they "merely set out CMS's understanding of the CAA's effect on … Medicaid and CHIP." Opp.27–28. That is wrong. They expressly purport to "end" 42 C.F.R. § 457.342(b). Ex.4, at 1. CMS is bound by that regulation until amended or repealed, *United States v. Nixon*, 418 U.S. 683, 695–96 (1974), and such change must be through notice-and-comment rulemaking, as is required whenever an agency "adopt[s] a new position inconsistent with ... existing regulations," *Shalala*, 514 U.S. at 100.

Even if the FAQs were exempt from notice and comment, CMS was *still* required to amend 42 C.F.R. § 457.342(b) through publication in the Federal Register, 5 U.S.C. § 552(a)(1), which would be final agency action subject to judicial review. CMS cannot avoid this Court by violating the very procedures that would indisputably lead to its review. This failure is alone enough to require the FAQs be set aside.

## III.   Florida Will Suffer Irreparable Injury

Florida will suffer ongoing, irreparable injury absent injunctive relief.

PI.Mot.21–25. *First*, Florida faces recurring harm each month when it is forced to choose between following its own laws or CMS's unlawful FAQs. Although no irreparable harm results from the *valid* federal preemption of a state law, Opp.18–19, a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039–40 (M.D. Fla. 2021). Florida's sovereign injury is thus intertwined with the merits of its claim that the FAQs are unlawful.[5]

*Second*, Florida independently faces irreparable harm through unrecoverable costs. Florida officials estimate that complying with the FAQs will cost the State approximately $1 million per month. Ex.1, Noll.Decl. ¶ 10. Even if that precise *amount* were "speculative," Opp.12—and it is not—CMS never disputes that Florida faces impending financial costs that are unrecoverable and thus constitute irreparable harm. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Nor does the timing of this case indicate a lack of imminence. *See* Opp.17–18. The FAQs were issued on October 27, 2023, and purported to "end" an existing regulation on December 31, 2023. Ex.4, FAQs at 1. Even though CMS unexpectedly subverted CHIP premium requirements, Florida filed suit only a month later on February 1, 2024, and simultaneously requested emergency relief because the irreparable injury is ongoing and will repeat each month.

---

[5] CMS questions whether Florida law requires disenrollment. Opp.18. Florida Statute § 624.91(5)(b)(9) provides that "nonpayment of family premiums" is "voluntary cancellation" as a matter of law, which necessarily results in disenrollment. PI.Mot.22. CHIP cost-sharing is also crucial to ensuring Florida meets its constitution's balanced-budget requirement. PI.Mot.7.

14

Florida did not lightly make the decision to sue, and it used those few weeks to assess the legality of the FAQs, the consequences of compliance, and the necessity of legal action. There's not even a plausible assertion of inexplicable delay. CMS invokes a case about a delay of "a few months," Opp.17, but the plaintiff there waited months *after filing suit* before seeking preliminary relief.[6] That's certainly not true here.

## IV.   The Balance of Harms and Public Interest Favor Florida

The balance of harms and public interest weigh in favor of a preliminary injunction. PI.Mot.25. CMS has no legitimate interest in unlawful agency action, and that is the end of the matter. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).

Further, Florida isn't asking this Court to "'ignore the judgment of Congress, deliberately expressed in legislation,'" Opp.28–29, but to enjoin a rogue agency action that, itself, brazenly ignores the plain meaning of statutory terms and infringes on Florida's sovereignty. Florida and its residents are best served by preserving the integrity and long-term sustainability of a program that serves some of the most vulnerable members of the community.

## CONCLUSION

The Court should preliminarily enjoin CMS from enforcing the FAQs.

---

[6] *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247–49 (11th Cir. 2016) ("unexplained five-month delay" in moving for preliminary relief after filing complaint). The significant delay other courts have deemed material confirms that Florida's actions here were not dilatory. *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912, at *1 (11th Cir. May 30, 2023) (six-month delay in moving for preliminary relief after filing complaint); *Powers v. Nielsen*, 806 F. App'x 958, 959–60 (11th Cir. 2020) (four-year delay in filing suit and one-year delay in moving for preliminary relief after filing complaint); *Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684, 687 (11th Cir. 2019) (three-year delay in filing suit); *Powers v. Sec'y, Fla. Dep't. of Corr.*, 691 F. App'x 581, 583–84 (11th Cir. 2017) ("unexplained" three-year delay in filing suit); *see also Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 151, 158–59 (11th Cir. 2021) (four-to-five-month delay in filing counterclaims and moving for preliminary relief after being sued *did not* undermine irreparable harm).

Dated: March 5, 2024

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

/s/ Natalie Christmas
Natalie Christmas (FBN 1019180)*
COUNSELOR TO THE ATTORNEY
  GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

*Lead Counsel*
*Counsel for State of Florida*

/s/ R. Trent McCotter
R. Trent McCotter (*pro hac vice*)*
Jared M. Kelson (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

Andrew T. Sheeran
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*Lead Counsel*
*Counsel for Agency for Health Care*
  *Administration*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action.

Dated: March 5, 2024                    */s/ R. Trent McCotter*
                                        R. Trent McCotter